## IDA MATHEWS, Appellant, v. MODERN WOODMEN OF AMERICA.

### Division One, July 6, 1911.

1. **FRATERNAL BENEFICIARY ASSOCIATION:** Sctions 1408 and 7890, R. S. 1909: Applicability. Section 1408, R. S. 1909, enacted in 1897, does not apply to a policy issued in 1895, by a fraternal beneficiary association, and section 7890, then in force, declaring that no misrepresentations made in obtaining or securing a policy of insurance shall be material or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, does apply.

2. **CONTRACTS: Interpretation.** The just interpretation of a contract arises on the whole subject-matter. It must be viewed from end to end and corner to corner, and all its terms held in view. No substantive clause must be allowed to perish by construction unless insurmountable obstacles stand in the way of any other course.

3. ————: Forfeitures. Forfeitures are not favored by the law Courts never go out of their way to find them, but will enforce them when plainly set forth in the contract.

4. ———: Insurance Policy: Taken Against Company. The restrictive terms of an insurance contract must be taken most strongly against the insurer. The doctrine of *contra proferentem* is strictly applied with unaccommodating vigor to them, and ambiguities are blandly applied in favor of the insured. The principal obligation of such a contract is to pay the policy face when the contingency or event happens upon which payment is predicated; and if the contract is open to two constructions, one favorable to the insured and one not, if the insured has acted on the favorable construction, courts will take his view of it.

5. ———: ———: Intricate Technical Provisions: Bundled Up In Different Instruments. Where the elements of the insurance contract are to be drawn from application, by-laws and policy, all of which swarm with intricate technical provisions, stipulations, exceptions, conditions, provisos and limitations hedging liability about and looking to its avoidance, and all elaborately and shrewdly drawn, and tendered, ready-made, to and accepted by plain people, thereby laying pitfalls and forfeitures in ambush, the courts incline to pit judicial astuteness against the astuteness of the policy-maker; and this language is applicable to fraternal beneficiary associations, which have come to recognize insurance as their principal business.

6. ———: ———: Forfeiture: Bartender: Contradiction Between Policy and Application. Where by reading the application and the answers to questions therein with the by-laws of the fraternal beneficiary association together, it appears that the by-laws provide for a forfeiture of the policy in case the insured becomes a bartender, yet if there is a question in the application which means that the policy is to become void only in case of death "resulting" from such prohibited occupation, no forfeiture will be declared on the sole ground that the insured, a jeweler, after the issuance of his policy became a bartender, if there is no showing that his change in occupation resulted in his death.

7. ———: ———: Warranties. Warranties in the application for an insurance policy apply both to the company and the applicant.

8. ———: ———: ———: Promissory. That portion of the statute (Sec. 7890, R. S. 1909), declaring that "no misrepresentations made in obtaining or securing a policy of insurance shall be deemed material or render the policy void unless the matter misrepresented shall have actually contributed" to the insured's death, does not so refer to the future as to cover promises to be kept or broken after the policy takes effect; it relates only to existing facts.

9. ————: ————: **Interdicted Occupation: After Issuance of Policy.** A by-law enacted in 1897, declaring that any member of the fraternal beneficiary association who shall hereafter become a bartender "shall thereby, *ipso facto,* forfeit" his insurance policy, which "shall thereby become absolutely null and void," does not apply to a policy issued in 1895, whose holder became a bartender three years later, when suit is brought upon the same after his death. Such a by-law is ineffective to impair the obligations of a contract existing before its enactment.

10. **APPELLATE PRACTICE: Reversal: Peremptory Instruction: Judgment on Pleadings.** Where all the facts were developed, and a peremptory instruction and a motion for judgment on the pleadings were asked by plaintiff and refused, and it is held on appeal that both the motion and instruction should have been given, the case will not be remanded for a new trial, but remanded with leave to plaintiff to renew her motion for judgment on the pleadings, and if that motion is renewed, with directions that it be sustained.

Appeal from Jackson Circuit Court.—*Hon. H. L. McCune,* Judge.

REVERSED AND REMANDED *(with directions).*

*Scarritt, Scarritt & Jones* for appellant.

(1) Forfeiture of a contract of insurance is not favored by the court. The defense in this case is based solely upon the claim that the contract of insurance was forfeited by the insured on account of a breach of a warranty that in no way affected the event from which the liability arose. In other words, the same result would have happened and the same liability would have accrued if the breach of warranty had not occurred. Under these circumstances it cannot be doubted that Mathews had no knowledge of the prohibition, or the effect of the prohibition, in the by-laws regarding the business in which he was engaged. It is impossible to conceive that he was knowingly and continuously performing an act which would render his policy absolutely void, and at the same time was pouring money into the coffers of this Insurance Com-

pany. ' For these very reasons, among many others, the law looks with extreme disfavor upon the too frequent attempts of insurance companies to entrap the unwary—the innocent—the ignorant and the careless, by inserting in their policies provisions as to remote, hidden, forgetable or immaterial contingencies and calling them warranties, with the view that the unconscious breach of any of them on the part of the insured, will be successfully urged to defeat his policy, but which will not prevent the insurance company from accepting the premiums for years and years until the victim dies, and then—when no more premiums can be collected—the forfeiture can be declared against the unsuspecting dead man. McFarland v. Accident Assn., 124 Mo. 204; Renshaw v. Ins. Co., 103 Mo. 595; Renn v. K. of P., 83 Mo. App. 442; Wakefield v. Ins. Co., 50 Wis. 532. (2) This insurance policy is within the protection of sec. 7890, R. S. 1899. Kern v. Legion of Honor, 167 Mo. 471; Hudnall v. M. W. A., 103 Mo. App. 356. (3) Section 7890, R. S. 1899, includes warranties as well as mere representations. Jenkins v. Ins. Co., 171 Mo. 382; Jacobs v. Ins. Co., 146 Mo. 541; Kern v. Legion of Honor, 167 Mo. 471; Schuerman v. Ins. Co., 165 Mo. 641; Ashford v. Ins. Co., 98 Mo. App. 508; Herzberg v. M. B. of A., 110 Mo. App. 328; Keller v. Ins. Co., 93 S. W. 903. (4) The occupation of assured did not cause or contribute to his death. (a) Defendant did not in its answer charge that the occupation of deceased had any connection with his death. Kern v. Legion of Honor, 167 Mo. 471. (b) Plaintiff at the trial offered testimony to prove that the occupation of Mathews had nothing whatever to do with death and defendant objected to the introduction of such evidence as being wholly immaterial to the issues in the case and such objection was sustained. By objecting to and thereby excluding such testimony solely on the ground of immateriality, defendant concedes the fact offered to be proven. An-

thony v. Carp, 90 Mo. App. 395; Leicher v. Keeney, 98 Mo. App. 403; Ins. Co. v. Mfg. Co., 31 Mich. 346. (5) By the terms of the contract of insurance in this case the defendant is liable unless the death of Mathews was occasioned by his occupation, which is not claimed by the defendant. Laker v. R. F. U., 95 Mo. App. 353; Cunningham v. Casualty Co., 82 Mo. App. 607; Burnett v. Ins. Co., 68 Mo. App. 349; Ethington v. Ins. Co., 55 Mo. App. 129; Hale v. Ins. Co., 46 Mo. App. 508.

*Benjamin D. Smith* and *John Sullivan* for respondent.

(1) Section 7890 has no application whatever to the breach of a promissory warranty, which is in its nature a condition subsequent. "Misrepresentation, according to the law of insurance, is the statement of something as fact which is untrue, and which the assured states knowing it to be untrue and with the intention to deceive; or which he states positively as true, not knowing it to be true, and which has a tendency to mislead; such fact being in either case material to the risk." Clark v. Ins. Co., 40 N. H. 33; Mascott v. Ins. Co., 69 Vt. 116; Iron Co. v. Ins. Co., 134 Mass. 433; Daniels v. Ins. Co., 12 Cushing 416. How can it possibly be said that the fact that Mathews engaged in the saloon business in 1898 constituted a misrepresentation in his application for membership which was executed three years prior thereto. (2) There is absolutely no ambiguity in the terms of the contract.

LAMM, J.—Plaintiff is the widow of Robert J. Mathews, the latter dying in August, 1904. Defendant is an Illinois corporation organized as a fraternal beneficiary association under its laws, duly authorized as such to do a life insurance business in this State in

1895 and ever since. In that year Mathews became a member of a local lodge of defendant, designated as a "Camp," viz., Kansas City Camp No. 2002. As such member he received a benefit certificate (hereinafter designated a policy) whereby defendant contracted to pay plaintiff, his wife, the sum of $2000 in case of his death—said policy conditioned as presently appearing. Due proofs of death loss were made on defendant's forms, and policy payment was demanded and refused. Presently plaintiff, suing, was cast—an adverse verdict coerced by a mandatory instruction. Plaintiff appeals.

All sides agree jurisdiction is lodged here by virtue of constitutional questions raised, and we assume jurisdiction without discussing the grounds. Proceeding to the heart of the controversy, in small compass, it is this: When admitted as a member of the local camp in 1895, Mathews, a jeweler by trade, plied that vocation. In 1898 he became a saloon bartender and plied that trade for a livelihood until his death in 1904, paying all his dues as a member and dying, technically, in good standing. Relying on the terms of his application for membership, on its own by-laws and policy terms, defendant contends that by the very act of becoming a saloon bartender, without more, Mathews' policy became, *ipso facto,* at once forfeited. Accordingly, it tenders in court all dues paid by him subsequently to his change in vocations (R. S. 1909, sec. 6940), and in divers paragraphs of its answer makes allegations directed to a defense of non-liability. *Contra,* plaintiff asserts that by the same tokens (when certain provisions of our statutes are read into the policy) defendant is liable.

The pleadings are drawn with an eye to the foregoing contentions, their allegations being broad enough to admit proofs made, and both pleadings and proofs are pertinent to the several main propositions of law discussed by counsel in briefs and orally at this bar.

Therefore, the pleadings will not be reproduced in whole, or in part by way of summary.

A more ready understanding of the case can be had if we point out some phases of this record before considering main propositions. Thus (assuming facts already stated):

(1). Defendant offered no evidence tending to show that Mathews' being a bartender contributed to or caused his death. To the contrary, plaintiff offered in rebuttal to take the laboring oar and prove that the fact he sold malt, spirituous or vinous liquors over a bar as a saloon bartender in nowise contributed to or caused his death. Further, that he came by his death through other and independent causes. This offer was refused. The failure of defendant to offer proof on the point and the ruling on the foregoing offer of plaintiff throw some light on the theory of defendant, adopted by the trial court.

(2). Moreover, the admissions in the pleadings and at the trial were such that plaintiff was entitled to a mandatory instruction in her favor unless Mathews' occupation of a saloon bartender forfeited his policy. Plaintiff asked mandatory instructions, which were refused. This ruling puts it beyond question that the theory of the trial court was that his becoming a saloon bartender released all liability by forfeiting his policy. It was on that theory the court told the jury to find for defendant.

(3). There was no evidence one way or the other as to whether defendant's officers or agents, or Kansas City Camp No. 2002, or its officers or agents, had notice or knowledge of the fact that Mathews in 1898 left off his trade of jeweler and took up that of bartender. Nor is it shown that the officer of the local camp whose duty it was to receive dues received Mathews' dues with any such notice or knowledge. Nor is there any evidence tending to show that Mathews concealed his change of vocations, or by trick,

deceit or contrivance at the time threw dust in the eyes of such officers or agents or misled them.

(4). So that, the record warrants our assuming that Mathews paid his dues on the theory his policy was alive despite his change in vocation, and that defendant received his dues, as said, without notice or knowledge that he became a bartender three years after he took out his policy and thereafter plied that trade. Such knowledge, it seems, came to defendant after his death.

(5). There was a mere bit of evidence by plaintiff indicating that in a pinch one of her theories might be that defendant was not a fraternal beneficiary society at all as defined by our statutes, but was posing as one and masquerading under that name as an old-line insurance company. Counsel for plaintiff in closing their brief make some observations lending a little color to the same theory. But we put that theory aside. The admissions, pleadings, by-laws, policy terms and main propositions on both sides show no serious contention but that defendant is now and at all times was a fraternal beneficiary society. Not only so, but the record shows that the laws of Illinois, as interpreted by the Supreme Court of that State, and defendant's articles of association, put the fact beyond dispute. We think the trial court had the right to assume that fact.

With those preliminary observations, we pass to main propositions.

(a). Plaintiff invokes a statute, Revised Statutes 1899, section 7890, in chapter 119 on "Insurance," formerly Revised Statutes 1889, section 5849, as amended by inserting between the words "persons" and "shall" the phrase "citizens of this State," now section 6937, Revised Statutes 1909, reading: "No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this State, shall be deemed mate-

rial, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury.''

Plaintiff's contention is that (having regard to the date of the policy, viz., 1895) the foregoing section must be read and worked into the policy and taken as a substantive part and parcel of the contract. That when so read into it liability is established.

In this connection plaintiff's learned counsel assume the ticklish task of outlining defendant's position in advance. Prognosticating, they say defendant's contention will be that section 7890, supra, is not applicable to this policy because it does not relate to fraternal insurance at all; that defendant will also contend that another statute controls, viz., section 1408, Revised Statutes 1899, found in article 11 of chapter 12, Corporations, Private, enacted in 1897 (Laws of 1897, p. 132), relating to fraternal beneficiary associations—said section 1408, *inter alia,* ordaining as follows: ''. . . Such associations shall be governed by this act and shall be exempt from the provisions of the insurance laws of this State, . . . and no law hereafter passed shall apply to them unless they be expressly designated therein. . . .''

. Counsel, having by prophecy given a position to defendant, go on to argue justly that in 1895, when this policy was issued, said section 1408 was not in existence; that the history of the various enactments pertaining to fraternal insurance shows that no similar or equivalent provision was then in force; that we have ruled that fraternal insurance policies issued at that time fell within the purview of said section 7890. At this point they advance the additional proposition that defendant cannot invoke said section 1408, because to do so would be to make it retroactive, hence violative

of those constitutional provisions leveled against *ex post facto* laws.

For our purposes it may be allowed that said section 1408 does not apply, and further, that said section 7890, of the general insurance laws, does apply. This, because in the year 1895 there was a hiatus or lapse in our statutes pertaining to fraternal insurance. Former laws stood repealed, and the Act of 1897 (Sec. 1408) was not yet in force. Our brother GRAVES in a late case (Schmidt v. Supreme Court, United Order of Foresters, 228 Mo. 675) elaborately and with pains reviews our insurance laws from that viewpoint. He points out that the authority of Kern v. Legion of Honor, 167 Mo. 471, had not been impaired. Distinguished in Westerman v. Knights of Pythias, 196 Mo. 670, it was not weakened as authority for the following proposition (quoting, from the Schmidt case, the sum of the ruling in the Kern case), viz.: "That a beneficiary certificate issued in 1895, when there was no exemption as to fraternal beneficiary associations, was subject to the general insurance laws in so far as the alleged false statements in the application for the insurance was concerned." The Kern case so holding, the Schmidt case adopts that view of it. We adhere to it.

Moreover, in prophesying anent defendant's position, plaintiff's counsel are inadvertently betrayed into error. For defendant refuses to stand on a platform so accommodatingly furnished by plaintiff. It repudiates the role so assigned to it. *Contra*, it frankly admits that said section 1408 is not retroactive; admits that in 1895, at the birth of the policy, it was subject to the restrictions of said section 7890; and admits that if it were relying by way of defense upon a *misrepresentation* in the application as ground of forfeiture, it would be necessary for it to go on and establish to the satisfaction of the jury that the fact misrepresented actually contributed to the death of

the insured. The premises considered, the case may proceed on the theory that section 7890 applies and section 1408 does not apply to the policy.

(b). Defendant relies on the breach (not of the representation of an existing fact or an "affirmative warranty," but) of a "promissory warranty" in the nature of a condition subsequent, which breach it is argued resulted in a forfeiture of the policy. Counsel argue that section 7890, supra, has no application to a breach of that form of a warranty. That argument is met by contradiction.

Those contentions and kindred ones seek vital terms and provisions of the application, the policy and certain by-laws.

*Of the terms of the application.*

The written application consisted of certain questions and answers in writing and certain statements of fact and agreements on the part of Mathews. It starts out by stating that he made application for membership in the order and for $2000 indemnity in case of his death, and for the purposes of said application declares, answers and warrants as follows:

The first question, in part is: "Do you understand . . . that part of the laws (of the order) providing for the qualifications for and restrictions upon membership, and providing for the forfeiture of indemnity for untrue statements or answers in application, or failure to pay dues and assessments?" His answer was, "Yes."

The second was: "Do you understand and agree that the laws of this order now in force, or hereafter enacted, enter into and become a part of every contract of indemnity between the members and the order, and govern all rights thereunder?" His answer to that question was, "Yes."

The third was: "Do you understand and agree that this order does not indemnify against death from suicide, or from death *resulting* from occupations pro-

hibited to its members by its laws?'' His answer to that question was, ''Yes.''

The sixth paragraph of the application states applicant's occupation to be that of a jeweler and his place of business in Kansas City.

The seventh reâds: ''7. I am not engaged in any of the following occupations, viz.: Railway brakeman, railway engineer, fireman or switchman, miner, employee in gunpowder factory, wholesaler or manufacturer of liquors, saloon keeper, saloon bartender, balloonist, sailor on the lakes or seas, plow grinder and brassworker, professional baseball player, and professional fireman, or soldier in regular army, and agree that I will not hereafter, while a member of this order, engage in any of these occupations, except at the same time recognizing the full force of this order's law limiting or extinguishing its liability upon the certificate of any member engaging in such occupations.''

The eighth is an agreement by applicant to pay dues and assessments and to conform in all respects to the laws, rules and usages of the order ''now in force ·or which may hereafter be adopted.''

The ninth is to the effect that this application and the laws of the order form the sole basis of applicant's admission to membership and of the policy issued. It then provides that untrue and fraudulent statements or answers made to the camp physician or any concealment of facts, intentional or otherwise, in the application ''or my being suspended or expelled from or voluntarily severing my connection with the order shall forfeit the rights of myself and my beneficiaries to all benefits and privileges therein or arising therefrom.''

The thirty-fourth reiterates that the foregoing answers and statements with the preceding declarations shall form the basis of the contract between the applicant and the order; that they are offered as a

236 Sup—22

consideration for the contract and are made and are to be taken as a part of the policy; that the one refers to the other and they shall all be construed together as one entire contract. It is further agreed that if any statement or answer is not literally correct or if the applicant failed to comply with and conform to any and all laws of the order now in force or hereafter adopted, the policy shall be void.

So much for the application.

*Of the by-laws in force in 1895.*

It is not essential that these by-laws should be exploited further than to say that they provide that the policy shall contain certain provisions. As it is not contended it does not contain the provisions, we omit them in part. Among other by-law provisions are the following:

"Eighth. If after a person has become a member of this fraternity he engages in any of the employments or occupations enumerated in Section A, Division 10, of these by-laws, his certificate thereupon shall be null and void. Provided, however, that a neighbor may, after becoming such member, without invalidating his certificate, be employed as a railway brakeman on freight train, railway engineer, fireman, switchman, miner employed underground, mine inspector, pit boss, professional rider or driver in race, employee in gunpowder factory, aeronaut, sailor on the lakes or seas, plow polisher, brass finisher, professional fireman, submarine operator, professional baseball player, professional football player, or soldier in regular army in time of war, if he shall, before entering upon any of the above mentioned occupations, file with the Head Clerk a written waiver of any liability of this order under his benefit Certificate, founded upon the death of such member, either as result of accident occurring in or disease directly traceable to his employment in such prohibited occupation. Such waiver, if not filed before the member's enter-

ing upon such prohibited occupation, shall have the same effect if filed at any time during his continuance in such employment, if accompanied by a certificate of sound bodily health.''

Also, Division 10, Section A.

''Section A. Persons to become members must be white males, over eighteen and under forty-five years of age, of sound bodily health and mind, exemplary habits, good moral character, and engaged in an honorable and lawful business or vocation. Persons engaged in the following kinds of business or employment shall not be admitted as members of this fraternity: . . . wholesaler or manufacturer of liquors, saloon keeper, saloon bartender . . . If after a person has become a member of this fraternity he engages in any of the employments or occupations herein enumerated, his Benefit certificate shall be forfeited by such act, and the same shall be null and void.''

So much for the by-laws.

*Of the policy terms.*

That instrument so far as material reads:

''This certificate, issued by the Modern Woodmen of America, a corporation organized and doing business under the laws of the State of Illinois, Witnesseth. That Neighbor Robert J. Mathews, a member of Kansas City Camp No. 2002, located at Kansas City, Mo., is, while in good standing in this fraternity, entitled to participate in its benefit fund to an amount not to exceed two thousand dollars, which shall be paid at his death to Ida Mathews, related to him as wife, subject to all the conditions' of this certificate and fundamental laws of this order and liable to forfeiture if said member shall not comply with said conditions, laws and such by-laws and rules as are or may be adopted by the Head Camp of this order from time to time, or the local camp of which he is a member.

"This Benefit certificate is issued and accepted only upon the following express warranties, conditions and agreements:

"1. That the application of said Robert J. Mathews and medical examination, which is made a part thereof, for membership in this order, and which is on file in the office of the Head Clerk and is hereby referred to and made a part of this contract for benefit, is true in all respects, and that the literal truth of such application and each and every part thereof, shall be held to be a strict warranty and to form the only basis of the liability of this order to such member and to his beneficiary or beneficiaries, the same as if fully set forth in this Benefit certificate. . . .

"7. This certificate is issued in consideration of the warranties and agreements made by the person named in this certificate in his application to become a member of this fraternity. . . .

"8. If, after a person has become a member of this fraternity, he engages in any of the employments or occupations enumerated in Section A, Division 1, of the Fundamental Laws, his certificate thereupon shall be forfeited by such act, and the same shall be null and void. Provided, however, that a neighbor may, after becoming such member, without invalidating his certificate, be employed as railway brakeman, engineer, fireman, switchman, miner, plow grinder, or employed in a gunpowder factory, or on the lakes or seas, or as a soldier in the regular army while in active service, if he shall, before entering upon any of the above mentioned occupations, file with the Head Clerk a written waiver of any liability of this order under his certificate of membership for loss by death as the direct result of his being engaged in such prohibited occupation.

"In Witness Whereof," etc.

In 1897, two years after the policy was issued,

defendant revised its by-laws and as part of that revision adopted the following:

"Section 12. Should any person who now is or who shall hereafter become a member of this society, hereafter enter upon the manufacture or sale of malt, spirituous or vinous liquors as a beverage, in the capacity of proprietor, stockholder, agent or servant, he shall thereby, *ipso facto*, forfeit all rights as a member of this society, either social or beneficial, and his certificate shall thereby become absolutely null and void, without any action on the part of his local camp, the Head Camp, or of this society, or of any of the officers thereof; and the payment by him of any dues or assessments thereafter made, or the acceptance thereof by the officers of his local camp, or of the Head Camp, or of this society, shall not have the effect of waiving such forfeiture or reinstating such certificate holder to any rights, benefits or privileges as a member of the society."

By another section of the revised by-laws of that date (Sec. 271), the clerk of the local camp was declared to be the agent of such camp and not of the "Head Camp," and no act or omission of the clerk of the local camp should have the effect of creating a liability for the society nor of waiving any right or immunity belonging to it.

Another section of the revised by-laws of 1897 reads:

"Section 274. The camp clerk shall not knowingly receive assessments or dues from any person who is engaged in the manufacture or sale of malt, spirituous or vinous liquors as a beverage, either in the capacity of proprietor, stockholder, agent or servant; provided, however, that the receipt, retention or transmission to the Head Camp of such dues and assessments shall not have the effect of waiving the forfeiture of the certificate of such member, or secure to him any rights whatever."

The foregoing is sufficient of the record for our purposes.

On such record, we observe:

(1). We must feel for and get at the meaning of the contract, for it is fundamental that our cardinal duty is to enforce it along the line of its true intendment,—object, subject-matter, parties and contract terms all considered. The just interpretation of a contract arises on the whole subject-matter. It must be viewed from end to end and corner to corner, and all its terms pass in review; for one clause may modify, limit or illuminate the other. Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course. Seeming contradictions must be harmonized away if that course be reasonably possible. Again, forfeitures are not favored by the law. Courts never go out of their way to find them, but will enforce them when plainly set forth and there can be no two ways about it. They will not be allowed if ambiguities can be fairly resolved against them. Speaking to insurance contracts, it is a just and settled rule that their restrictive terms shall be taken most strongly against the insurer. The doctrine of *contra proferentem* is strictly applied with unaccommodating vigor, and, as said, ambiguities are blandly resolved in favor of the insured. So that, if the contract in suit is open to two constructions, one favorable to the insured and one not, if the insured has acted on the favorable construction, courts will take his view of the contract—being always mindful that the principal obligation (the very life and soul) of a policy is to pay the policy face when the contingency or event happens upon which payment is predicated.

In Renn v. Supreme Lodge, 83 Mo. App. l. c. 447, the court by SMITH, P. J., happily announces good and acceptable doctrine, viz.: "Conditions and

provisions in policies are to be construed strictly against the company as they tend to narrow the range and limit the force of the principal obligation. Conditions providing for disabilities and forfeitures are to receive, where the intent is doubtful, a strict construction against those for whose benefit they are introduced."

In Wakefield v. Ins. Co., 50 Wis. 532, it was ruled, and soundly, too, that: "A continuing warranty" in a policy, the breach of which avoids it irrespective of the question whether damage or injury results to the insurer by reason of such breach, "is in the nature of a forfeiture and must therefore be construed most strictly against the insurer and most favorably to the insured." In the Wakefield case the court quoted with approval from Boon v. Aetna Ins. Co., 40 Conn. l. c. 586, the following apposite announcement of law: "It is the duty of an insurance company seeking to limit the operation of its contract of insurance by special provisos or exceptions, to make such limitations in clear terms and not leave the insured in a condition to be misled. The uncertainties arising from provisos, exceptions, qualifications and special conditions in or indorsed upon policies, have been often condemned, and such special modifications are justly characterized as traps to deceive and catch the unwary. An insured may reasonably be held entitled to rely on a construction favorable to himself where the terms will rationally permit it."

When the nice points of learning of insurance law are considered, by and large, together with the complex nature of the subject-matter itself, dealing, as it does with the capital event of death, and the protection of the widow and the fatherless, the lively and abiding concern of lawgiver and court is not to be wondered at. Policies are contracts, elaborately and shrewdly prepared in advance by calculating and astute experts. They are tendered, ready-made, to and

accepted out of hand by plain people, the uninformed and unlearned, the unwary and confiding. Insurance policies swarm with intricate technical provisions, stipulations, exceptions, conditions, provisos, limitations, hedging liability about and looking to its avoidance. It is not singular then that courts incline to pit judicial astuteness against the astuteness of the policy-maker, the latter planting forfeitures in ambush or open, and the former striving to avoid them.

In Dezell v. Fidelity and Casualty Co., 176 Mo. l. c. 265, our brother VALLIANT speaking for us said: "Courts do not favor forfeitures, nor do they favor the defeat of a meritorious cause on any purely technical ground. Insurance companies have probably realized that fact more clearly than any other class of business concerns. . . . . And not only have the legislatures exerted their authority in such matters, but the courts of the country also have strained the discretion that lies in the scope of judicial interpretation to prevent a forfeiture of the insurance. Sometimes the reasoning of the court in such case is so technical that to the mind of the layman it but thinly disguises the praiseworthy determination to do justice in that particular case in spite of the letter of the contract."

That language is applicable to both fire and life insurance, nor have we any call to exclude fraternal benefit certificates therefrom. This, because, whatever may have been the case at the origin of that form of insurance (when social and fraternal features were far in the ascendancy, from head authority down to local lodge, and insurance was a mere incident), those who now prepare policies for fraternal societies recognize that insurance is the principal thing, and they have come to imitate old-line insurance companies in ranging about the principal obligation rows of intricate and highly technical exceptions, provisos and limitations, that, in the language of Justice WILLIAMS in

Boyle's Sons v. Ins. Co., 169 Pa. St. l. c. 355, "stand bristling like armed sentinels around the contract and the liability of the company thereunder, ready to impale even an honest claimant on a bare technicality."

The insurance policy in suit is a typical one of its kind. Its elements are drawn from several sources —by-laws, application, etc. The provisions thus brought together in a policy-bundle create ambiguities and seeming contradictions, crying aloud for elucidation and harmonizing. They must be brayed in the mortar of reason with the pestle of good sense.

Quickened by such precepts and admonitions, we come to a closer view of the case.

(2). Reading the questions, answers and statements of the application together with the by-laws into the policy (as its terms require should be done), it appears that some of the by-laws provide for forfeiture in case the member becomes a bartender. But those by-laws must be construed in connection with the third written question propounded in the application, viz.: "Do you understand and agree that this order does not indemnify against death from suicide or death resulting from occupations prohibited to its members by its laws?" It seems to us there is great significance coiled up in that question. When it was propounded to Mr. Mathews his answer was, "Yes." Presumably the application was the sober and careful handiwork of defendant. It had an obvious purpose. Thereby defendant talked to Mathews and gave voice to its own view of the scope and character of its own indemnity contract. By necessary implication, does not that question mean that the insurance defendant offers, the indemnity, does not extend to death "resulting" from prohibited occupations? Does it not thereby say to Mathews if you do not go into a prohibited occupation, the indemnity is general, but if you go into a prohibited occupation and death *results*

from such occupation, I will pay nothing to your wife?

Speaking of warranties (whether affirmative or promissory) and representations (whether affirmative or executory), the question spontaneously obtrudes itself, viz.: Is it alone the applicant who can make them or be impaled by them? May not defendant also impale itself on such hook? Did not this defendant, by asking that question of Mathews and in saying to him, "Do you understand and *agree*" to that effect, by the same token also "agree," by way of a promissory warranty or an executory representation (it taking *two* to make a bargain), that the indemnity of the policy was not forfeited by a prohibited occupation *unless* death "results" therefrom? Is not that question, is not that answer and is not that agreement, *ex vi termini,* read into the policy and writ large there? We think so. Therefore, we are no more at liberty to cause that provision of the policy to perish by construction, than we are at liberty to cause the provisions relied on by defendant to so perish. Our duty is to give effect to them all by harmonizing them if that can be done. To that task we address ourselves.

Counsel suggest the seeming policy contradictions may be harmonized by construction, giving them all due play and office by construing the contract to mean as if it read this way: "It is agreed between the parties hereto as follows: In consideration of the payment of Robert J. Mathews of the initiation fee (now received) and the prompt payment of all dues and assessments hereafter levied, the Modern Woodmen of America (a corporation) does hereby insure the life of the said Robert J. Mathews in the sum of two thousand dollars for the benefit of Ida Mathews, his wife, subject to the by-law of this corporation which provides that should any member engage in any of the occupations by said by-law prohibited his certificate shall become forfeited, and no indemnity shall be paid

to his widow, provided death results from his engaging in such prohibited occupation; and it is further agreed that no warranty made by the said Robert J. Mathews in obtaining or securing this insurance shall be deemed material or render this insurance void unless the matter unwarranted against shall have actually contributed to the death of the said Robert J. Mathews.''

Allowing for ambiguities and solving them in favor of the insured, allowing for seeming contradictions and smoothing them away by construction so that all substantive provisions may be given some life, and all substantive limitations assigned some office, we are of opinion that the foregoing view of the contract is in substance the common-sense of it and results in no injustice. Thereby the widow is dealt tenderly with, all doubts are solved in her favor, and peradventure the basic principles of fraternity and brotherhood are in no wise wounded or subverted.

(3). We are asked by defendant to rule that section 7890, supra, relates to representations made of *existing* facts, and not to executory promises or promissory warranties.

We are asked by plaintiff to rule that section 7890, when construed in the light of the reason of the law, is broad enough to include all warranties whether as to existing facts or conditions that may spring into existence in the future.

It has been ruled that the word ''misrepresentation'' used in that section includes warranties. [Jenkins v. Mutual Life Ins. Co., 171 Mo. 382.] But the court in that case did not hold in judgment the kind of warranty counsel for plaintiff have in mind. The warranty dealt with in the Jenkins case was one pertaining to a fact existing when the insurance was taken out. The breach of warranty there counted on related to the health of the insured at the time the application for the policy was made. The case, there-

fore, is no controlling authority on the question confronting us. The language of the statute is: "No misrepresentation made in *obtaining* or *securing* a policy of insurance . . . shall be deemed material or render the policy void unless the matter misrepresented shall have actually contributed," etc.

The phraseology is inapt to cover promises referring to the future and to be kept or broken after the policy takes effect. A provision of somewhat similar character in the statute relating to fire insurance has been construed that way. [Hoover v. Ins. Co., 93 Mo. App. 111.] If put to it, we could assign no sufficient reason why the lawmaker did not write the law to cover promissory warranties or executory agreements —the future as well as the past and present; for if an applicant conceal or misrepresent an existing fact and that misrepresentation does not avoid liability except where the matter misreprsented actually contributes to the contingency or event on which the policy is to become due and payable, no good reason at first blush occurs to us why the same statute should not have gone on to include promissory warranties, the breech of which do not contribute to the same contingency or event. But a statute may stand: *Stat pro ratione voluntas.* It will be time enough to construe the law the way plaintiff insists when, if ever, the lawmaker writes a statute so couched as to be fairly susceptible of that construction. This one is not so written.

But the foregoing view is not fatal to recovery, even with that limitation on the statute; for construing the application, by-laws and policy as one instrument and as constituting the contract (as we have done in a former paragraph), such contract is equivalent to what plaintiff's counsel insist the statute means.

(4). Hitherto we have not determined what force should be given to the amended by-law of 1897 (Sec.

12). That by-law has dual features. It is leveled at the social rights of the member as well as at his property rights in his benefit certificate. So far as disclosed on this record, up to the time of the passage of that by-law, the social and fraternal rights of a member of the Modern Woodmen of America were not affected by his becoming a bartender. So far as we stand informed, the pursuit of such interdicted vocation prior to the year 1897 diminished, limited or otherwise affected the insurance contract alone. The new by-law, however, deals with both. We are interested only in that feature of it dealing with his property rights.

Speaking to that point, the by-law may be dismissed with these observations. In the first place, as a social or fraternal organization merely, the correct doctrine is that under the terms of membership in this order the member may be bound by it although passed subsequently to his becoming a member and during the life of his membership. In the second place, if it leave the member's property rights in his benefit certificate the same as they were before its passage, then it is not of substance in determining the merits of this suit. In the third place, if it impair the substantive property rights of the member in his insurance contract as that contract existed before its passage, then, by the law of the land, it becomes inoperative in so far as it impairs the obligation of a contract previously entered into between the company and Mathews. Such is the *rationale* of Schmidt v. Supreme Lodge, 228 Mo. 675, supra. The question is there so exhaustively considered that no new or further exposition is necessary. Our conclusion is, in any view of it, that said by-law should not control our disposition of this case.

(5). It is argued for plaintiff that the eighth clause of the policy refers to employments or occupations "enumerated in Section A, Division 1 [*sic*]

of the Fundamental Laws'' and not to Section A, Division 10, where certain employments are interdicted by the by-laws. Some stress is laid on that fact but we cannot very well allow any significance to it. Such exposition would be straining at a gnat. The context clearly points to a mere clerical mistake in omitting a cipher after the figure ''1.''

The premises all considered, we hold on this record that the widow was entitled to recover. She moved below for judgment on the pleadings. Her motion was overruled and her counsel saved an exception. On this record, the court committed error in so ruling. It erred again in not giving her mandatory instruction. As the case was fully developed and, as developed, points to but one end, it would be idle to send it down for trial anew to a jury. Accordingly, the judgment is reversed and the cause remanded with leave to plaintiff to renew her motion for judgment on the pleadings. When that motion is renewed the court is directed to sustain it and render such judgment. All concur, except *Valliant, J.,* absent.

PER CURIAM.—On Motion for Rehearing.

Respondent's motion is aided by printed suggestions of a new aggregation of veteran and learned counsel. In those suggestions, *inter alia,* it is said our decision gives such an undue and magnified office to question number three and the answer thereto in the application that it ''with a mere straw, blown by chance breeze, as it were by the wind, overturns and demolished the fundamentals and foundation stones of the institution.'' Elsewhere it is contended that all ''the prohibitions against that business [the saloon business] wisely enacted as the society believed, perishes by construction.'' Judicial interest in that behalf has been challenged by those graphic and animated criticisms but, on reconsideration, we find nothing in the opinion warranting such gloomy infer-

ences and drastic results.

There is a line in one of the good old Olney hymns in point, viz.:

> "Afflictions, though they seem severe,
> In mercy oft are sent."

Defendant should be glad to remove pointed out ambiguities well calculated to confuse or mislead an applicant about to assume the tender relation of a brother. The opinion does not deal with the right to expel a member for becoming a barkeeper. It is colorless on the question of whether a policy may be canceled in a proper way during his life for engaging in a prohibited occupation. It is not calculated to touch, let alone demolish, "the fundamentals and foundation stones of the institution." Rather it supports them in a fraternal way. It merely holds that the fraternity should pay to the widow of the brother the policy sum, when, as here, his occupation did not result in his death or cause the fraternity any loss, and where, as here, under present policy terms, construed favorably to the insured, that construction fairly arises on the whole subject-matter. Before entering into that contract the deceased brother did not have the benefit of the acute and rather stern analysis of counsel wise in the law. He was *inops consilii*—doubtless, an unlettered, plain citizen, disarmed of all critical disposition to analyze propositions because in the presence of those with whom he was about to assume genuinely fraternal ties. To reconstruct that situation and to resolve ambiguities, we put on his shoes, "sit in his arm chair" and look at the matter a little through his "spectacles" and acts. It was with that end in view and in that spirit the opinion was written—confessedly solving every contract doubt in favor of his widow. We were glad to do that, because in so doing we were within the law of such a case.

The motion is overruled.