Steve RAGSDALE (Plaintiff), Respondent,

v.

TOM–BOY, Inc. (Defendant), Appellant.

No. 29857.

St. Louis Court of Appeals.

Missouri.

Nov. 5, 1958.

Motion for Rehearing or to Transfer to Supreme Court Denied Dec. 5, 1958.

Daniel P. Reardon, Joseph G. Stewart, St. Louis, for appellant.

G. W. Marsalek, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, St. Louis, for respondent.

DOERNER, Commissioner.

This is an action begun in the Circuit Court of the City of St. Louis, in which plaintiff sought the recovery of $30,273.13 upon an alleged contract of employment. Judgment below was for plaintiff in the sum of $5,321.00, from which, after the overruling of its timely motions, defendant has duly prosecuted its appeal to this court.

Defendant, Tom Boy, Inc., is a wholesale food company, owned in part by grocers, butchers, and other retailers of food. Its primary purpose is to act as a buying organization for its members, to whom it sells at a very small mark-up, so that they may in turn sell more cheaply, and meet the competition of chain stores. In addition, the defendant operates a warehouse and runs an advertising campaign for its members' stores.

Prior to June, 1951 plaintiff was employed as a consulting engineer by the United Fresh Fruit and Vegetable Association. His work consisted of analyzing the business operation of the members of the Association and of offering them advice as to how they could increase their sales and reduce their costs. In connection with his

work he had occasion to call on the defendant three or four times, and on one or more of such visits the men in charge of defendant's produce department asked him if he would be willing to join their organization. Following discussions with Mr. L. A. Dauer defendant's then vice-president, plaintiff wrote out a letter in long hand addressed to Dauer advising him that he would accept the position offered him with the defendant, and setting forth the terms of the employment. Plaintiff's wife typed this letter, which was dated May 8, 1951, and mailed it. Plaintiff testified Dauer had asked him to send such a letter, for "internal reasons within the organization," and to avoid any misunderstanding. The following day plaintiff discovered that his wife had overlooked sending a copy to Mr. Krekeler, the president of defendant, as had been requested, and she typed another letter dated May 9, 1951, similarly addressed to Dauer, which was mailed to Krekeler. The defendant denied ever having received the letter of May 8, but admitted having received the one dated May 9, which read:

"1225 Appleton Ave.
Independence, Mo.
May 9, 1951.
"Mr. L. A. Dauer, Vice President
Tom Boy Stores. Inc.
4353 Clayton, Ave.
St. Louis, Mo.

"Dear Mr. Dauer:

"I am writing in connection with our telephone conversation today, wherein I reported I could accept the position you have offered with your organization, effective at the latest by July 1, 1951, or as soon before that date as possible. There is a good possibility the effective date can be as early as June 15, 1951. There will be no delays beyond July 1, 1951. I regret that special commitments make some delay necessary.

"We briefly discussed the recent meeting between you and Mr. Krekeler

and myself in St. Louis. You commented it might be a good idea to cover some of the details in writing. As I understood our conversation, these basic points were a part of our verbal agreement:

"1. The position you have offered is considered by you as a permanent position in your organization.

"2. The title of the position will be Assistant Vice President in Charge of Perishables.

"3. The initial duties will first be in connection with getting the produce department into a profitable position, after which responsibilities in other departments may be assigned.

"4. The position will carry complete responsibility for all phases of operation in the produce department. All personnel will report to me and I will report to you.

"5. The basic salary will be $8500 per year. We will attempt to make 2% net profit. The amount in excess of 1% net profit for the fiscal year will be added to this basic salary. For example, if the yearly sales are $1,200,000 and the net profit is 2%, the salary for the year will be $12,000. Mr. Krekeler mentioned an addition might even be considered if the department was taken only out of a losing position.

"I will appreciate you confirming, or correcting the above understanding and effective date at your earliest convenience. After receiving that confirmation, the necessary final arrangements will be started.

"Your offer is a promising opportunity. I consider it as a real compliment to me and I am looking forward to a long and profitable relationship with you and your organization.

"Thank you again for your patience.

"Sincerely Yours,
/s/ Steve Ragsdale"

The letter of May 8 was exactly the same, except that instead of the word "the" preceding the words "salary for the year will be $12,000" in sub-paragraph 5, the word "that" was used, so that that sub-paragraph in the letter of May 8 read:

"5. The basic salary will be $8500 per year. We will attempt to make 2% net profit. The amount in excess of 1% net profit for the fiscal year will be added to this basic salary. For example, if the yearly sales are $1,-200,000 and the net profit is 2%, that salary for the year will be $12,000. Mr. Krekeler mentioned an addition might even be considered if the department was taken only out of a losing position."

Shortly thereafter plaintiff received the following letter from defendant:

"May 11, 1951

"Mr. Steve Ragsdale
1225 Appleton Avenue
Independence, Missouri
"Dear Steve:

"Glad to hear from Mr. Dauer that you will be with us sometime prior to July 1. We have a grand opportunity in our produce department and I personally feel confident you can get the job done.

"Your letter is per all agreements excepting you forgot to mention we agreed to pay your moving expense to St. Louis, Steve, we won't have any trouble on salary. We want men with ability to make money for the Company. The Company wants to make at least 1% net on produce and any excess will be shared with the person responsible for the success.

"All points covered by your letter is as we agreed upon. We will be happy to have you associated with Tom Boy and will give you every assistance possible to help you get things on the right track in the shortest time possible.

"Yours very cordially,
"Tom Boy, Incorporated
/s/ Clem Krekeler
"Clemens G. Krekeler
President"

Thereafter plaintiff severed his connection with his other activities, moved from Independence, Missouri, where he had been living, to St. Louis, and began his employment with the defendant on June 18, 1951, being given complete charge of its fruit and vegetable department. He revised its sales and buying programs, its method of handling and delivering merchandise, and endeavored to assist its customers, the retailers, in increasing their sales and profits. As a result, while the defendant's fruit and vegetable department had lost money during the preceding eighteen months, under plaintiff's direction it became a profitable operation.

From the time he started to work for the defendant on June 18, 1951, until the end of the defendant's fiscal year, in April, 1952, plaintiff was paid a salary on the basis of $8,500 per year. At that time he had a discussion with defendant, as a result of which his rate of pay was increased from $8,500 per year to $12,000 per year, retroactive to June 18, 1951, by the payment to him on April 26, 1952 of the sum of $2,423.32. Plaintiff introduced in evidence a copy of an inter-office memorandum which he testified was given to him by Ollie Anderson, secretary-treasurer of defendant, at the time he was paid that sum.

Beginning with the period ending May 26, 1951 plaintiff received periodically from the defendant a report showing the results of the operation of the produce department for the preceding four weeks' period. None were furnished plaintiff in the months of April, May, and June, 1952, but after he had had his discussion regarding the

adjustment of the payments to him, and at his insistence, the furnishing of such reports was resumed. The reports, which were received in evidence, showed the gross sales figure, less the returns, which when subtracted from the gross sales gave the net sales figure; the cost of the goods sold was not shown in the reports, but the figure given for percentage of gross profit was stated, as was the amount in dollars of gross profit (obtained by multiplying net sales by the percentage of profit). To the figure for gross profit there was added such other income as charges for rural drayage, and from the resulting sum there was subtracted the total of the operating expenses of salaries, wages, truck rental, depreciation, telephone, office expenses, miscellaneous expenses, allocated or overall administrative expenses, the difference being given on the reports as "net profit or (loss)."

Plaintiff submitted a letter of resignation to the defendant around the third or fourth week in December, 1952, but continued to work for it until the early part of January, 1953. He testified that after he had received the adjustment of his monthly check, in April 1952, he asked more than once for the figures on the net profit of the produce department for the fiscal year ending in April 1952, but that he never received them. After he left the defendant's employment he made oral demands to Mr. Krekeler by telephone, in January or February 1953, as to when they were going to settle up, and was told that they didn't know what they were going to do with the produce department. Plaintiff's action was instituted on March 16, 1955. Attached to his petition was a copy of his letter of May 8 to Mr. Dauer. In his preparation for trial, plaintiff filed a request that defendant admit or deny that the copy of the letter of May 8 was a true copy of the original, and admit or deny that the original was received by the addressee. Defendant answered the request, denying that the copy was a true and genuine copy of any letter addressed to Dauer, and denied that the

original was received by him. On the day of trial, by leave, plaintiff amended his petition by striking the date "May 8, 1951" and inserting that of "May 9, 1951"; and by substituting a copy of the letter of May 9 as an attached exhibit in lieu of the copy of the letter of May 8.

Plaintiff testified that in the produce business it is the custom and usage to determine net profit by subtracting the expense of doing business from the gross profit. Using the monthly operating statements furnished plaintiff while he was in its employ, as well as one for the period ending January 3, 1953 produced during the trial (which showed a net loss for the period of $9,802.20), and also figures furnished by defendant for the period from March 30, 1952 to June 24, 1952, plaintiff testified that the net profit for the period during which he was in defendant's employ was $36,808.48; that the percentage of net profit could be determined by dividing that figure by the total sales for the same period, and that his calculation showed it to be 1.47 per cent; that the amount of the net profit in excess of one per cent was $11,761.09; that at the rate of $8,500, his basic salary for the time he was with the defendant would have been $13,200, which with the profit in excess of one per cent, $11,761.09, would have amounted to $24,-961.09; that he had been paid a total of $19,640.41; and that the amount still owing him was $5,321.09.

Defendant's initial complaint is that the court erred in overruling its motion for a directed verdict at the close of the plaintiff's case; first, because there was no proof of the contract pleaded, whereby plaintiff was to receive all of the net profits of defendant's produce department in excess of one per cent; and secondly, because the term "net profit" should have been construed to mean the net profit after income taxes. The gist of its argument on the first part of the assignment is that the offer and acceptance, as made by plaintiff's letter of May 9 and defendant's reply of

May 11, were so indefinite that there was no meeting of the minds of the parties. Regarding the defendant's reply of May 11, it is maintained that it did not constitute an unequivocal acceptance of plaintiff's offer, because, although the defendant's president stated that "Your letter is per all agreements," he also stated that "The company wants to make at least 1% net on produce and any excess will be shared with the person responsible for the success."; and that to agree to share was not an agreement to give all.

■■ It is true, as defendant contends, that a contract requires a meeting of the minds of the parties, that is, that there must be a definite offer and an unequivocal acceptance. Cottonseed Delinting Corporation v. Roberts Brothers, Inc., Mo., 218 S.W.2d 592; and that if the contract is fairly open to two interpretations, that construction must be adopted which is most strongly against him who prepared it and most strongly in favor of him who merely signed it. Leathers v. Metalcraft Mfg. & Sales Corp., Mo.App., 240 S.W.2d 211. However, this guide to construction is usually applied to a situation in which the entire contract is contained in a single instrument, drafted by one of the parties. Where, as here, the contract is declared on as created by correspondence, the correspondence must show that the terms offered by one party were accepted by the other. Union Service Co. v. Moffet-West Drug Co., 148 Mo.App. 327, 128 S.W. 7.

Defendant's attack on plaintiff's offer of May 9 is directed at sub-paragraph 5, which read:

"The basic salary will be $8500 per year. We will attempt to make 2% net profit. The amount in excess of 1% net profit for the fiscal year will be added to this basic salary. For example, if the yearly sales are $1,200,000 and the net profit is 2%, the salary for the year will be $12,000. Mr. Krekeler mentioned an addition might even be considered if the department was taken only out of a losing position."

It concedes that the first three sentences are clear and unambiguous; that the defendant understood from this that plaintiff was offering to work for defendant for a basic salary of $8,500; that the parties would undertake to make a net profit in the produce department of 2%; and that the amount in excess of 2% would be paid to plaintiff as an addition to his basic salary. But it contends that when the plaintiff said "For example, if the yearly sales are $1,200,000 and the net profit is 2%, the salary for the year will be $12,000.00" that plaintiff meant, and defendant understood, that the total of both the basic and the additional salary would be limited to $12,000. In part, its argument is based on the fact that in his letter of May 8 plaintiff had said "*that* salary will be $12,000," which, it admits, made it clear that the example given by the plaintiff referred only to the additional salary and not to the total salary. But, as it admitted, the letter of May 8 was never received by defendant, so that there can be no valid claim that the slight difference between the two tended to confuse or mislead it. Hence in determining the intention of the parties we must consider only plaintiff's letter of May 9, and defendant's reply of May 11.

■■ A cardinal rule to be observed in construing a written contract is that the intention of the parties must be ascertained and given effect, and that "'greater regard is to be had to their clear intent than to any particular words they may have used in attempting to express it.' Larson v. Crescent Planing Mill Co., Mo.App., 218 S.W.2d 814, 819." Truck Leasing Corp. v. Esquire Laundry & Dry Cleaning Co., Mo. App., 252 S.W.2d 108, 111. It is clear that plaintiff expected a basic salary of $8,500 per year. It is also clear that in addition to his basic salary the plaintiff expected to receive all of the net profits of the produce department in excess of 1%. And we think

it is equally clear that the example he used referred to the determination of the additional salary and not to that of the total salary. The "example" contained two mathematical variables, the sales volume and the percentage of profits, both well identified by the word "if," which to a person of ordinary intelligence could only mean that plaintiff was stating a hypothetical situation, illustrative of the manner in which the additional salary would be determined.

What has been said with regard to the ascertainment of the intention of the parties in construing a contract applies with equal force to defendant's letter of May 11 replying to plaintiff's offer. In the second paragraph of that letter it was stated "Your letter is per all agreements * * *." Defendant concedes that this was tantamount to saying "accepted," but contends that when the defendant subsequently said "The Company wants to make at least 1% net on produce and any excess will be shared with the person responsible for the success" it thereby made a counteroffer to plaintiff which had the legal effect of rejecting his proposal. If the words "any excess will be shared" stood alone, some support might be found for defendant's position, for ordinarily the verb "share" is defined as meaning to partake of or enjoy with others; to have a portion of or to participate in. And it has been said that to share does not necessarily mean an equal division. 80 C.J.S., p. 141. But the word must be considered in the context in which it is used. It should be pointed out that the language employed was that of the expression of the Company's general policy, rather than that of a counter-offer directed to plaintiff, for the sentence immediately preceding it is "We want men of ability to make money for the Company." Furthermore, the statement by the defendant that the Company wanted to make at least 1% net on produce accorded with plaintiff's proposal that the amount in excess of 1% net profit would be added to his basic salary, for defendant's language im-

plied, of course, that the Company would retain the first 1% of the net profits. And it is significant that the writer of the letter then reiterated his acceptance of the plaintiff's terms by beginning the last paragraph of his letter with the sentence "All points covered by your letter is as we agreed upon."

It has been said that "The entire agreement must be considered in determining the meaning of each part thereof; and, although effect should be given to every part of the agreement, if that be fairly and reasonably possible, seeming contradictions should be harmonized away to effectuate the underlying purpose of the parties as evidenced by the whole instrument." Cook v. Tide Water Associated Oil Co., Mo.App., 281 S.W.2d 415, 419. And see State Mutual Life Assurance Co. of Worcester, Mass. v. Dischinger, Mo., 263 S.W.2d 394; Mathews v. Modern Woodmen of America, 236 Mo. 326, 139 S.W. 151. Taking into account the evident intention of the parties to record the terms of the contract through an exchange of letters, the lack of any clear-cut words of renunciation in defendant's letter of May 11, and the twice-expressed acceptance of "all points" covered in plaintiff's letter, as well as the tone of agreement with and welcome to the plaintiff which permeates defendant's letter, it is readily apparent that defendant acquiesced with plaintiff and accepted his proposals as made.

As to the second sub-division under its first point, it is defendant's contention that the term "net profit" as used in plaintiff's letter of May 9 meant net profit after income taxes. It cites Lowenstein v. Becktold Company, 362 Mo. 1089, 246 S.W.2d 780, in which the term "net profits" was construed to mean profits after income taxes, but the basis for the conclusion reached in that case was that the conduct of the parties during their negotiations which resulted in the lease in question clearly showed that they had in mind net profits after income taxes. Nevertheless, in that case it was recognized that the meaning of

the term may vary when it is used in wholly dissimilar situations. And in the later case of Harvey v. Missouri Valley Electric Co., Mo., 268 S.W.2d 820, 821, 49 A.L.R.2d 1124, our Supreme Court said "The meaning of 'net profits' and what is included therein varies according to the context in which, and the circumstances under which, the words are used. 'The words in bookkeeping language mean a balance, or what remains after something has been deducted. What the deduction shall be, or what it shall include, must be determined from the occasion for the use of the words, or from the context * * *.' Iowa Southern Utilities Co. v. Cassill, 8 Cir., 69 F.2d 703, 707."

In that case there was no testimony of prior negotiations or circumstances which threw light on the intention of the parties, but there was evidence of the construction which the parties themselves had placed upon the term, and in reaching its decision our Supreme Court relied upon their construction. Similarly, in this case there is no evidence as to the discussions or negotiations that preceded the exchange of letters which might assist us in arriving at their intentions. There is testimony in this case as to custom and usage, the plaintiff testifying that, as was done on the monthly operating statements, it was in accord with custom and usage to deduct the operating expenses from gross profit to determine net profit; while Krekeler testified that net profit is what remains after the payment not only of the usual operating costs, but also of income taxes. It is to be kept in mind that the parties were concerned only with the net profit from the operation of the produce department, not that of the entire company, and that if the determination of the net profits of the produce department were to be determined by deducting a part of the income taxes of the entire corporate enterprise some complicated computations would be required to allocate to the produce department its fair proportion of the entire tax; for that determination would be affected by the results ob-

tained in the operation of each of the other departments, and would give rise to intricate problems of accounting in the making of the allocation.

But as in the Iowa Southern Utilities case, the construction which the parties themselves have placed upon the contract is decisive. The periodic statements furnished to the plaintiff of his operation of the produce department, after giving the gross sales and the total operating expenses, ends with the figure for "Net profit or (loss)." In the light of this evidence we conclude that the trial court did not err in refusing to direct a verdict for the defendant.

Defendant's next assignment of error is that the court erred in giving plaintiff's instruction No. 1, his verdict directing instruction, because it employed but failed to define the term "net profits." Plaintiff did offer and the court gave instruction No. 4, which read:

"The Court instructs the jury that if you believe and find from the evidence that the parties, in using the terms 'net profits' referred to by them were the net operating profits of said produce department without any deduction for income taxes, then you will in your deliberations exclude income taxes in determining said 'net profits.'"

So far as the meaning of the term "net profits" was concerned, the only difference between the parties was whether income taxes should or should not be deducted in determining net profits. When the instructions are read and considered together, as they must be, Layton v. Palmer, Mo., 309 S. W.2d 561; Banks v. Koogler, Mo., 291 S. W.2d 883; Nelson v. O'Leary, Mo., 291 S. W.2d 142, it is apparent that they were harmonious, clear and complete.

Defendant also assigns error in the giving of instruction No. 4 because it "assumes the existence of the contract for which plaintiff contended." But the exist-

ence of the contract as contended for by plaintiff was covered in instructions 1 and 2, and when read together with instruction No. 4, it is clear that the jury was first required to find that a contract as pleaded by the plaintiff was in fact made. Nor is it subject to the complaint made by defendant that it invaded the province of the court because it was the duty of the court to construe the contract. While it is true that the meaning of plain and ordinary words is a matter for construction by the court, yet where a dispute exists as to the interpretation to be placed upon an ambiguous word or phrase, particularly of technical terms, and resort to extrinsic evidence is necessary, which is conflicting, the construction of the agreement is for the jury under proper instructions from the court. National Corporation v. Allen, Mo. App., 280 S.W.2d 428. Restatement of The Law of Contracts, Sec. 235. Defendant's final complaint as to instruction No. 4 is that it "is beyond the scope of the pleadings, and of the evidence in the case" because the words "net operating profits" were not used in either the pleadings or the evidence. The dispute as to the meaning of the term "net profits" was not raised in either the plaintiff's petition nor the defendant's answer. That issue arose during the course of the trial, when the court properly permitted both plaintiff and defendant to introduce extrinsic evidence as to the meaning of the term. Other than the issue of whether there was a meeting of the minds of the parties through the exchange of their respective letters of May 9 and May 11, it was the primary issue in controversy, and was clearly within the scope of the pleadings and the evidence.

■ The next assignment of error relates to testimony of the plaintiff that he gave the pencilled copy of his letter of May 8 to his wife to type, that he was away from home when she typed it, and that as far as he knew, his wife mailed it. Defendant's motion to strike on the grounds of hearsay was overruled. The record shows that in his opening statement counsel for plaintiff sought to inform the jury as to his expectation of what the evidence would show as to the mailing of the letter of May 8 by plaintiff's wife. An objection by defendant to the competency of such evidence was sustained. In his direct testimony, plaintiff made no reference to the letter of May 8, but on cross-examination the defendant subjected plaintiff to a lengthy and vigorous cross-examination as to the facts surrounding the preparation and dispatching of plaintiff's letter of May 8, as well as his letter of May 9. On redirect examination, plaintiff was asked to and did give the circumstances surrounding the preparation and mailing of the letter of May 8. Plaintiff contends that the objection to the evidence that plaintiff's wife mailed the letter came too late, since prior answers had indicated that plaintiff was not at home when she typed it, and that having opened up the subject on cross-examination, defendant is in no position to complain. Regardless of the merits of these contentions the error in the admission of the evidence, if it was error, was harmless. After the defendant, in answer to the requests for admission, had denied receiving plaintiff's letter of May 8, plaintiff conceded that it had not been received by defendant, and amended his petition to plead his letter of May 9 as the offer made by him. Hence the letter of May 8 was not in issue in any way, and the question as to who mailed it was immaterial and could not have affected the result. An appellate court may not reverse a judgment unless it believes that error was committed against the appellant materially affecting the merits of the action. Section 512.160 RSMo 1949, V.A.M.S.; Smith v. St. Louis Public Service Co., Mo., 277 S.W. 2d 498; Blanford v. St. Louis Public Service Co., Mo., 266 S.W.2d 718.

■ Defendant's fifth major assignment of error is that the court erred in admitting in evidence the periodic statements, for the reasons that "they were hearsay, not properly identified and qualified" and

because they were immaterial and irrelevant. However, the transcript shows that defendant's only objection to the introduction of these records was as to their materiality, hence we will consider the assignment as restricted only to that ground. By the plaintiff's testimony it was shown that these statements were prepared by and furnished to him by the defendant, during his employment with it, and that they were intended to reflect the results of the operation of the produce department, of which he was in charge, for the period given. Defendant's evidence was that similar reports were regularly given to each department head. As heretofore stated, the reports give the gross sales, the gross profit, the total operating expenses, and the net profit or loss. Clearly the statements were material on both the issue of the manner of determining net profits, and the question as to the amount of the net profits defendant had realized during plaintiff's employment. Browder v. Milla, Mo.App., 296 S.W.2d 502; Burkhardt v. Decker, 221 Mo.App. 1066, 295 S.W. 838.

■ Defendant's next assignment is that the trial court erred in not granting it a new trial upon its affidavit of newly discovered evidence, filed in support of its motion for a new trial. The gist of the motion is that one week after the end of the trial of this case defendant learned that plaintiff was making a claim against another employer, purportedly based upon a written contract of employment; that such alleged contract does not exist; and that the pattern of negotiations of said purported contract resembles very closely the pattern of negotiations in the instant case. In support of its argument that all of the elements necessary for the granting of a motion for a new trial on the grounds of newly discovered evidence are present defendant cites Browhaw v. Dowd, Mo.App., 187 S.W.2d 29. In that case, loc. cit. 30, it was said:

"Before a court can grant a new trial on the ground of newly discovered evidence, the party in whose favor the order is made must show * * * (6) that the object of the evidence is not merely to impeach the character or credit of a witness. (Citing cases.)

"In the case at bar the newly discovered evidence was of an impeaching character. Its discovery could be no ground for a new trial. (Citing cases.)"

Obviously, the only purpose of such evidence would be that of impeaching plaintiff's credibility. Under the rule announced in the Browhaw case such evidence, even though newly discovered, furnished no ground for a new trial.

■ Defendant's next assignment of error relates to the admission in evidence, on rebuttal, of a letter to plaintiff dated December 27, 1952, from Mr. L. A. Dauer, defendant's then vice-president, in answer to plaintiff's letter of resignation. Complaint is made that the letter was not proper rebuttal. During the trial defendant had attacked plaintiff's credibility and character as well as his business qualifications and abilities; and had intimated that it had terminated plaintiff's employment. On cross-examination, Mr. Krekeler was asked whether or not plaintiff had ever asked for certain reports, and he replied that the plaintiff had not, and that had plaintiff done so "his job would have terminated much sooner." In rebuttal, plaintiff was permitted to offer in evidence the letter from Mr. Dauer, which expressed regret at plaintiff's resignation and complimented him on the favorable results he had obtained during his management of defendant's produce division. Dauer was then defendant's vice-president, in charge of its perishable department, and had been and was still then plaintiff's immediate superior. Further, he had been the corporate representative with whom plaintiff had originally

discussed the possibility of his employment by the defendant, and the corporate officer to whom plaintiff addressed his written offer. Defendant's only objection was that the letter was not rebuttal under any circumstances. Technically, there may be some doubt as to the admissibility of the letter for the announced purpose for which it was introduced, but we are of the opinion that as a declaration of defendant's agent, acting within the scope of his authority, the letter was admissible in rebuttal on the collateral issue of the merits of plaintiff's capabilities and his management of the produce division, which issue defendant had interjected into the case. Shelton v. Wolf Cheese Co., 338 Mo. 1129, 93 S.W.2d 947; Mattan v. Hoover, 350 Mo. 506, 166 S.W. 2d 557.

Defendant's eighth and final assignment is that on redirect examination Mr. Krekeler was not permitted to explain what he had meant by the sentences "Your letter is per all agreements excepting you forgot to mention we agreed to pay your moving expenses to St. Louis, Steve, we won't have any trouble on salary." Since there was no ambiguity in such language, the intention of the defendant was to be gathered from the letter itself. Mickelberry's Food Products Co. v. Haeussermann, Mo., 247 S.W.2d 731; Holmes v. Freeman, Mo.App., 150 S.W.2d 557; Ward v. Gregory, Mo.App., 305 S.W.2d 499.

For the reasons given, the Commissioner recommends that the judgment below should be affirmed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

RUDDY, P. J., and ANDERSON and WOLFE, JJ., concur.