48 So.2d 695 (1950)
TRASCHER
v.
EAGLE INDEMNITY CO. OF NEW YORK et al.
No. 19522.
Court of Appeal of Louisiana, Orleans.
November 13, 1950.
*696 Stanley A. Baron, New Orleans, for plaintiff and appellee.
Henry G. Neyrey, Jr., New Orleans, for defendants and appellant.
McBRIDE, Judge.
This is a suit for damages sustained by Mrs. Rose Trascher Davis, on December 6, 1947, in a collision between her automobile and the automobile of Dr. Homer D. Barber, on South Claiborne and Napoleon Avenues. Mrs. Davis, who claims the sum of $25,000.00 for personal injuries and damages to her automobile, has directed her suit against Dr. Barber and Eagle Indemnity Company of New York, his liability insurer.
After the accident, Dr. Barber moved to the State of Mississippi, and service was had upon him, as a nonresident, through the Secretary of State of Louisiana, in accordance with Act No. 86 of 1928, as amended. He was eliminated from the case when his exception to the service made upon him was maintained.
This matter was first tried below in March, 1949, and plaintiff recovered judgment against the insurer for the sum of $7,500.00, from which said defendant appealed to this court. Subsequently, it developed that the stenographer had lost the shorthand note books containing some of the testimony taken in the case, and upon joint motion of counsel for both parties, we reversed the judgment and remanded the case to the district court for a trial de novo.
*697 The matter was retried in January, 1950, and the judge below again eliminated Dr. Barber and rendered judgment in favor of plaintiff for $7,500.00 against the insurance company, and again said defendant has appealed. Plaintiff has timely answered the appeal, and prays that the judgment be increased to $10,000.00, which is the limit of the liability of the insurance company under its contract with Dr. Barber.
At the time of the accident, Mrs. Davis was alone in her car, and in the other car, which was being driven by Dr. Barber's wife, were four passengers, two of whom were infants. There is a sharp dispute as to exactly where the automobiles collided. Mrs. Davis testified that shortly before the accident, she had left her home on State Street to drive to a restaurant on the downtown-lake corner of South Claiborne and Napoleon Avenues. Each of the avenues is a wide thoroughfare having two lanes for vehicular traffic, separated by a neutral ground. She insisted that she came down South Claiborne, crossed Napoleon, and then, at General Pershing Street, which is one block farther down, she turned left towards the lake, and then into the uptown bound traffic lane of South Claiborne Avenue. She then proceeded up South Claiborne, with the intention of turning right into Napoleon Avenue and parking in front of the restaurant, but upon reaching the intersection of Napoleon Avenue, she stopped at the corner in obedience to the traffic light which was showing red against her, and while she was waiting for a favorable light change, her car was violently struck from its rear by the Barber automobile.
Mrs. Barber and one of her passengers testified that the Davis car was not stopped at the corner, but was parked double at the side entrance of the restaurant on South Claiborne Avenue, which is some distance from the corner, and that Mrs. Davis appeared to be waiting for someone who was inside the restaurant.
As per his written reasons for judgment, the trial judge found as a fact that the Davis automobile was stopped at the corner waiting for the light change, and from a reading of the testimony, we are convinced that this finding is correct. But, be that as it may, the point is relatively unimportant, as will be hereafter seen.
The severity of the impact between the two cars is also a disputed question. The front part of the Barber automobile was driven directly into the rear of the Davis car, and we can not believe that the blow was as slight as Mrs. Barber and her witnesses would have the court believe. Dr. Barber's automobile was towed from the scene, as it was damaged to such an extent that it could not be moved under its own power, and from the nature of the physical damage sustained by both cars, there is no question whatever in our minds that the impact was a heavy one. The Barber car was damaged to the extent of about $300.00, and the proven damages sustained by the Davis car amounted to $278.40.
As we have said, just where the Davis car was located when struck is of no moment, because, according to Mrs. Barber's own testimony, she observed it when she reached General Pershing Street, one block away, and there was ample opportunity for her to have stopped her car completely, long before reaching the Davis car. Her story is that she was travelling at a moderate rate of speed, and that upon seeing the Davis car she attempted to apply her foot brake, but it did not hold, and that when she applied the service or emergency brake, it also failed, and there was a perceptible odor of smoke.
It is strenuously argued that Mrs. Barber was not at fault, because her automobile was afflicted with a latent defect. The testimony shows that the automobile was a 1947 Mercury, which had been purchased less than three months before, and that it had been driven only between 2000 and 3000 miles. Mrs. Barber disclaims any prior knowledge of any defect in the car, and states that she had no reason to believe that any existed, and that she did not learn of the defectiveness of the brakes until just at the moment when she reached General Pershing Street and attempted to make the stop, and that the accident *698 was unavoidable. She maintains that shortly before the collision she had driven the car through the business section of the city, which necessitated frequent stops being made, and that on the occasions of those stops the brakes worked perfectly, and continued to function properly up until the time she neared the Davis car, and that it was only when she applied them at this point that they went out. The last time the brakes of the car had been inspected was in Rochester, Minnesota, in October of 1947, two months or so before the accident.
There is authority for the proposition that the driver of a motor vehicle is not responsible for latent defects in his car, where he exercises reasonable care in having the car inspected. However, for that doctrine to be a valid defense, the proof submitted must be so strong as to exclude any other reasonable hypothesis with reference to the cause of the accident, except that it resulted solely from the alleged defects. Hassell v. Colletti, La.App., 12 So.2d 31.
Appellant can gain no comfort from the doctrine, as we do not think it should be applied here. Although Mrs. Barber postulates that the brakes failed because of a latent mechanical imperfection, there is no proof whatever in the record in that regard, save her unsupported statement that the brakes would not work when she called upon them. The automobile was repaired after the accident, but for some reason undisclosed to us, the mechanic who did the work was not produced as a witness, and there is no expert testimony showing that the brakes were not in working order, or that it was necessary to repair the brakes. We think the mechanic would have been the proper party to testify as to those details, because he certainly was in a superior position to have thrown light upon the whole matter. The requirement of the law, that one relying on the doctrine of latent defects must make out the defense with certainty, has not been met in the instant case, and we readily conclude that the accident was caused solely and only through the fault of the operator of the Barber automobile.
Plaintiff, who was severely jolted by the impact, was taken by ambulance, in a dazed condition, to the nearby Baptist Hospital, where, at her request, her physician, Dr. John F. Oakley, was summoned. In addition to being treated by Dr. Oakley, plaintiff was treated at various times by Drs. Lyon K. Loomis, Trinidad Ramos, and John T. Capo, the latter a dentist, all of whom testified as plaintiff's witnesses.
As frequently happens in cases of this kind, there is irreconcilable conflict in the testimony of the medical experts, the testimony of the physicians in the one camp being diametrically opposed to that of the physicians in the other camp.
Plaintiff remained in Baptist Hospital from December 6 to December 20, 1947. X-ray pictures made there, as interpreted by Dr. Loomis, showed that Mrs. Davis had an old ruptured intervertebral disc between the fifth and sixth cervical vertebrae, which was aggravated by trauma. His opinion was that when the impact of the automobiles took place, plaintiff's neck was snapped in such a way that there was a tearing loose of some of the old adhesions between those vertebrae. Dr. Loomis ordered the patient placed in traction for a period of about twelve days, which, we understand, consisted of a halter being placed around her head and neck, from which weights were suspended, with boards under her mattress to keep her body immobile. Upon Mrs. Davis's discharge from the hospital, she was admonished to wear a surgical neck brace, with which she was fitted, and was told that when not wearing the brace she should remain in bed. She wore the neck brace, off and on, for two or three months. Some three weeks after being discharged from the hospital, Mrs. Davis was again seen by Dr. Loomis, and at that time she stated to him that, while her neck felt somewhat better, she continued to wear the brace at night, and that she experienced headaches both day and night. The doctor's examination of her on that occasion disclosed that her neck motion was limited. Dr. Loomis treated Mrs. Davis intermittently from the date of the accident up to the date of the second trial below, and the *699 record shows that in addition to the visits made to her by the doctor while she was in the hospital, she called at his office thereafter seven times for examination and interrogation, and about twenty-six times for diathermy treatment to her neck and lower back.
Dr. Loomis advanced the opinion that the condition existing in Mrs. Davis's neck is permanent, and that he did not expect "a lot of improvement."
For about four or five days during her stay in the hospital, plaintiff's abdomen became distended, this condition having developed the day following the accident. She was unable to empty her bladder, and Dr. Oakley, who treated her for this complaint, was of the opinion that such condition frequently follows injury to the spine, the central nervous system, or to the abdomen. An indwelling catheter was inserted to relieve the bladder distension, and was left in place for five or six days, until the patient regained her bladder tone and other treatment became effective. For some reason, the catheter caused an irritation, and Mrs. Davis developed vaginal ulcers on the labia minora.
Plaintiff continued to suffer from the bladder complaint throughout the early part of 1948, and was under treatment by Dr. Oakley periodically until the date of the first trial, March 8, 1949. Dr. Oakley's testimony taken at the first trial had been preserved, and was reoffered in evidence on the second trial. Over the objection of defendant's counsel, Dr. Oakley was permitted to testify that one of the ulcers would not heal, and that it was necessary to rehospitalize the patient for excision of this ulcer, and she remained in the hospital on that occasion for some six days. The basis of the objection was that the operation was performed after suit was filed, and that in the absence of a supplemental petition by plaintiff claiming damages for the operation, no testimony regarding it was admissible. The trial judge overruled the objection and admitted the testimony, only for the purpose, however, of showing the seriousness of Mrs. Davis's condition resulting from the infection. We believe the judge was correct. In the absence of a supplemental petition claiming damages for the operation, the testimony was clearly inadmissible for the purpose of proving an increased claim against the defendant, but for the purpose of showing the seriousness of Mrs. Davis's condition as it existed at the time of the institution of the suit, the testimony was admissible.
On November 30, 1949, Mrs. Davis called at the office of Dr. Trinidad Ramos, complaining that she experienced severe pain in the neck and shoulders, and pain in the lower back which radiated down the posterior leg region. Dr. Ramos had X-ray pictures made, and according to her they showed that there was a narrowing of the discs between the fifth and sixth and sixth and seventh cervical vertebrae. Dr. Ramos said that the picture also showed some marked arthritic changes on the anterior parts of the vertebrae, and her examination of the patient showed that there was muscle spasm from the back, close to the fifth, sixth, and seventh vertebrae, to the shoulder, accompanied by swelling. Dr. Ramos advanced as her opinion that the narrowing of the disc was caused by trauma, and that Mrs. Davis would be permanently disabled because of the neck injury received in the accident.
Both Drs. Loomis and Ramos, while agreeing that an operation might possibly relieve Mrs. Davis's neck condition, stated that the procedure would be dangerous, and that they would not advise the patient to undergo the operation.
Some testimony emanated from Drs. Loomis and Ramos regarding Mrs. Davis's lower back, but the testimony on that point is not at all clear, and is somewhat confusing, and we are unable to say that any abnormality existing in plaintiff's lower back was caused by the accident of December 6, 1947.
The plaintiff's mouth was examined by Dr. Capo's office on January 7, 1948, and the findings were that her lower anterior teeth were traumatized inward, lingually, and there was some swelling in the mouth, as the result of a blow. The lower dental *700 appliance which she was wearing at the time was malformed or bent. Mrs. Davis was still under Dr. Capo's care at the time of the trial on January 18, 1950, and he testified that he was not sure whether he could save her lower teeth from extraction. At this point we might say that although plaintiff claims damages for the loss of five teeth, Dr. Capo testified that six were involved, and we gather from the record that these teeth are the only remaining natural ones in Mrs. Davis's mouth. On cross examination, Dr. Capo stated that he had examined Mrs. Davis seven or eight days before the trial, and while there was some possibility that the teeth might be saved, such was highly problematical.
The medical experts appearing for defendant were Drs. H. Theodore Simon, J. Kelly Stone, and Tracy T. Gately, the latter a radiologist.
Dr. Gately made some X-ray pictures of Mrs. Davis's back, and from his study of them, as well as of those which had been made previously by other radiologists, he discerned no ruptured discs, but did see a narrowing of the spaces between several vertebraecervical, dorsal, and lumbar which he believed was caused by arthritis all up and down the patient's spine. Dr. Gately, when asked if trauma could have caused the condition, said: "Yes; but it's a rather unusual trauma that would jump from spot to spot. It may hop, but it is unusual."
Dr. Simon, an orthopedic surgeon, examined Mrs. Davis from a clinical orthopedic standpoint on November 15, 1948, almost a year after the accident, and also studied the many X-ray plates. He was of the opinion that there were no clinical findings indicating disability in any of the regions complained of by Mrs. Davis. The X-ray plates of the cervical, dorsal, and lumbar and sacral spine, according to Dr. Simon, showed no evidence of old or recent injury, but there was a narrowing of the intervertebral spaces due to arthritis in plaintiff's spine. The doctor was interrogated by the trial judge, and was particularly asked if a person suffering from osteo-arthritis, such as Mrs. Davis, had experienced trauma due to an automobile accident on December 6, 1947, what would be the extent of her suffering and disability in such case. Dr. Simon stated that osteo-arthritis might be aggravated by trauma, and that in his report on this case he had made the statement that, in his opinion, if such condition was present in the plaintiff it had already ceased when he saw her. He agreed that an aggravation of osteo-arthritis by trauma can produce active symptoms, complaints, and discomforts associated with a clinical picture, over a period of months and sometimes over a year or so.
Dr. Stone saw Mrs. Davis in the Baptist Hospital on December 17, 1947, while she was in traction, and his examination of her was only superficial. His testimony was generally confined to an interpretation of the hospital records of the case. On cross examination, Dr. Stone stated that trauma could have caused the distension of the abdomen, and that the use of a catheter might cause vaginal ulcers.
The trial judge believed that the evidence preponderated in favor of plaintiff's contentions, and a most careful study of the transcription of the medical testimony leads us to the belief that the judge was correct in that conclusion. It seems to us that out of some forty X-ray plates the physicians should be able to state whether there was evidence of a traumatic injury in plaintiff's spine, but because of the divergent opinions of the doctors, all of whom are of high standing in this community, it is difficult indeed for us, as laymen, to say which of the two lines of testimony should be accepted. It must not be overlooked that, from the date of the accident up to the date of the second trial in the lower court, plaintiff was under the treatment of Drs. Loomis and Ramos, while on the other hand, Dr. Gately merely gave his findings from a reading of the X-ray plates, and Dr. Simon saw plaintiff on but one occasion, and then for the purpose of a clinical examination only, about a year after the accident.
In view of the fact that Drs. Loomis and Ramos treated Mrs. Davis for her injuries over a considerable period of time, *701 it would seem to us that they are in a better position to state the extent of their patient's injuries, complaints, and disabilities, and their testimony should be accorded more weight. Courts frequently accept the testimony of the attending physician over that of other experts who merely examined the patient. For instance, in the case of Vienne v. Chalona, La.App., 28 So. 2d 154, 157, decided by this court, we said: "* * * it appears to us that, since Dr. Harrison has had the advantage of treating Miss Madeline for a long period of time and is intimately acquainted, through personal contract, with the nature of her disabilities, whereas, the doctors for the defendants have examined the lady once only or possibly twice and are forced to depend in large measure upon the history of her ills in formulating their views, the former's opinion is entitled to be accredited more weight. * * *"
If, as a result of the accident, the old intervertebral disc injury in Mrs. Davis's spine was aggravated, the defendant, under our law, is responsible in damages, for it has been said that a tort-feasor must take his victims as he finds them.
In Poncet v. South New Orleans Light & Traction Co., 3 La.App. 64, we quoted what had been said by the Supreme Court in the leading case of Lapleine v. Morgan's L. & T. Railroad and Steamship Co., 40 La.Ann. 661, 4 So. 875, 877, part of which is: "* * * The duty of care and of abstaining from injuring another is due to the weak, the sick, the infirm, equally with the healthy and strong; and, when that duty is violated, the measure of damage is the injury inflicted, even though that injury might have been aggravated, or might not have happened at all, but for the peculiar physical condition of the person injured."
We believe that plaintiff, a woman forty-seven years of age, suffered severe, painful, and permanent injuries as a result of the crash. There is yet the possibility that she will lose her remaining teeth. That she suffered great pain and discomfort, is reflected by the record, for in addition to her testimony on that point, the hospital record shows that opiates were administered to her from time to time to alleviate her suffering. According to the testimony of her medical experts, she will continue to suffer for the rest of her life, and the only source of relief would be from an operation, which they testified was dangerous and not advisable.
The amount claimed for Dr. Loomis's bill is $650.00, and other medical expenses aggregate $571.75. In addition thereto, there were nurses' fees in the sum of $102.00, salary of nursemaid, $240.00, surgical collar, $30.46, and cab fare to and from the doctors' offices.
The amount claimed for repairs made to the Davis automobile, $278.40, was proved by the testimony of the machanic who did the work.
It was also shown that the plaintiff was unable to attend the shower on December 7, 1947, given for her daughter who was soon to be married, and it was necessary for her to wear the surgical collar to her daughter's wedding, with the attendant discomfort and embarrassment.
Counsel for appellant contends that some of the medical, the nurses' and maid's bills are highly excessive and should be reduced. He particularly singles out the bills of Drs. Loomis and Capo for criticism. We do not deem it necessary to make inquiry into the reasonableness of the expenses under attack. Our opinion is that the judgment for $7,500.00 should not be revised in any manner.
In the case of Baird v. Employers' Liability Assur. Corp., La.App., 38 So.2d 669, this court awarded a woman forty-eight years old, who had suffered a ruptured disc between the fifth and sixth cervical vertebrae, and who was subsequently operated upon for the condition, the sum of $12,000.00, but in that case the injuries were more aggravated than in the case at bar. There is no rule or standard for measuring damages for personal injuries, and their assessment is entirely within the discretion of the court, and former decisions are not controlling, but are used merely as guides. We believe the award in this case does adequate justice.
The judgment appealed from is affirmed.
Affirmed.