**Susan C. BOEHM, a Minor, by Her Mother and Next Friend, Esther May Batch, Respondent,**

v.

**ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, and Sgt. Howard Nelson, Appellants,**

No. 49325.

Supreme Court of Missouri,

Division No. 1.

May 13, 1963.

Rehearing Denied June 4, 1963.

David G. Dempsey, Richard B. Dempsey, Clayton, Edmund W. Albright, St. Louis, Eaker, Dempsey, Heath & Dempsey, Clayton, for plaintiff-respondent.

Donald W. Bird, St. Louis, for appellant, St. Louis Public Service Co.

Byron G. Carpenter, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant, Sgt. Howard Nelson.

HOUSER, Commissioner.

Suit for damages for personal injuries sustained by an 11-year-old girl when a motor scooter on which she was riding as a passenger was struck by a public service company bus in a street intersection in St. Louis. Susan C. Boehm, pro ami, filed suit against St. Louis Public Service Company and Howard Nelson, operator of the scooter. A jury awarded plaintiff $55,000. After remittitur ordered and entered the verdict was reduced to $32,500, for which judgment was rendered against both defendants. Both defendants have appealed.

The collision occurred within the intersection of Michigan Avenue and Schirmer Street. The streets are approximately level. Michigan runs generally north and south. Schirmer runs generally east and west.

Michigan is 35 feet 9 inches wide. Schirmer is 30 feet wide. A building located on the southeast corner of the intersection extends out to the sidewalk line. The sidewalk on the Michigan side of the building is 12 feet wide. The sidewalk on the Schirmer side is 9 feet 9 inches wide. Stop signs control east-west traffic on Schirmer. There are no stop signs at that intersection for the control of north-south traffic on Michigan. The stop sign for westbound traffic on Schirmer is located 13.7 feet east of the east curb line of Michigan. The distance between Schirmer and Courtois Street, the next street south of Schirmer, is 320 feet. There was a bus zone on the east side of Michigan located, according to plaintiff, one half block south of the intersection. The bus driver placed the bus stop 40–50 feet south of the intersection.

The collision occurred in the late afternoon of December 15, 1959. It was dark, or dusk, dark enough that lights on vehicles were turned on. Immediately preceding the collision the bus was traveling north on Michigan and the motor scooter was traveling west on Schirmer.

Nelson, with plaintiff seated behind him holding onto his waist, drove the scooter west on Schirmer, and came to a stop with the front wheel even with the stop sign. The scooter was "right over at" the north curb line of Schirmer. Plaintiff looked both to the north and to the south, and Nelson turned his head both ways. Nelson then "inched" his way forward to get a better view of the traffic, stopping a second time at a point probably halfway between the stop sign and the east curb of Michigan. When plaintiff looked south she saw a northbound bus, moving at 20 m. p. h., about a half block south of the intersection, traveling on the right or east side of the center of Michigan. She marked a cross on the plat showing where the bus was when she first saw it, and according to the scale, the bus was 132 feet south of the south curb line of Schirmer when she first saw it. The bus appeared to be slowing down and pulling in toward the east curb line of Mich-

igan a little bit. It did not stop at the bus stop, but continued on north. When the bus was 60 feet south of the intersection it was going 15 m. p. h. At that place the bus operator could see the stop sign. There was nothing to obscure his vision. The bus operator was some 30 feet south of the intersection when he first took a look at the intersection. The bus brakes were in good operating condition. At 15 m. p. h. the bus could be stopped in an emergency in 35 feet. The bus was traveling 10–20 m. p. h. as it entered the intersection, and at that point the operator started to accelerate the speed of the bus. The scooter was at the stop sign about 3 seconds; long enough for Nelson to ask plaintiff which way to go to get to their destination, and for plaintiff to tell him to go straight ahead. The scooter proceeded into the intersection. The next time plaintiff saw the bus it was 9 feet away. The bus was traveling 10 or 11 feet out from the east curb line of Michigan; 3 feet east of the center line. The front of the bus hit the scooter when the scooter was more than halfway across Michigan. The bus driver gave several versions of when he first saw the scooter. The answer most favorable to plaintiff was his admitted previously given testimony that he did not see the scooter prior to the accident, or at least not until it was "practically in front of [him]; right on top of [him]," only 15 feet away from the bus. The bus driver "went for his brakes, to make an emergency stop" but the brakes did not take ahold before the impact occurred.

Respondent has filed a motion to dismiss Company's appeal for failure of the statement of facts to conform to Supreme Court Rule 83.05(c), V.A.M.R. Company has moved to dismiss respondent's brief for failure to comply with Supreme Court Rule 83.05, and has moved to strike respondent's suggestions in support of her motion to dismiss, as scandalous and libelous under Supreme Court Rule 55.35. We have examined the several motions, the brief and the transcript of the evidence. Without indicating approval of Company's statement of facts, or respondent's brief or suggestions, all of the motions are overruled without comment.

*Public Service Company's Appeal*

The cause was submitted to the jury as to defendant Company on negligent failure to keep a lookout and watch ahead and laterally ahead of westbound traffic on Schirmer.

Company's first point is error in not directing a verdict for failure of plaintiff to introduce substantial evidence that Company had the means and ability to avoid the collision had a vigilant watch and lookout been kept; that "there was no substantial evidence adduced as to where the front of the bus was when Nelson pulled into the intersection"; that plaintiff failed to establish the exact point where the bus operator became chargeable with knowledge that plaintiff had entered a position of danger, and failed to show that thereafter the bus operator had the time and ability to avoid a collision, and therefore there was no evidence from which the jury could find that failure to keep a lookout was the proximate cause of the collision. The alleged failure of proof is based on the theory that the probative value of the testimony of plaintiff was destroyed because it supports several inconsistent factual inferences, and is contradictory and conflicting, one version tending to prove the issues, the other tending to disprove them.

■ Inconsistencies in a plaintiff's testimony are for the jury to resolve, unless they are diametrically opposed to each other with respect to some vital question in the case, so contradictory and without explanation as to preclude reliance thereon, and rob the testimony of all probative force, and so glaring as to conclusively show that the party testified untruthfully one way or the other. Ringeisen v. City of St. Louis, Mo. App., 238 S.W.2d 57, 63.

■ Plaintiff, a 13-year-old girl at time of trial, was subjected to intensive and ex-

haustive cross-examination which takes up 66 pages of the transcript. Some discrepancies, inconsistencies and variations were elicited, but none fatal to the submission, under the rules referred to in Ringeisen, supra.

First, Company says plaintiff first testified that the scooter stopped approximately even with the stop sign, remained stopped for three seconds, pulled forward and came to a second stop, and remained stopped for an additional three seconds (a total elapsed time of six seconds) and later, inconsistently, testified that the total length of time that elapsed for both stops was three seconds. The record reveals no such sharp and clearly defined contradiction. Plaintiff, on cross-examination, testified that the motor scooter was even with the stop sign about three seconds and that the scooter then moved up a little bit to a second stop. Asked how long she was at a stop the second time, she said "Altogether, it was three seconds—about three seconds." Again she was asked "How long were you at a stop the second time?" After an objection the court asked the witness whether by "altogether" she meant at the second stop or including both first and second stops. The question was repeated. Plaintiff inadvertently said "Three minutes" which, called to her attention, she corrected to "three seconds." When again asked about the length of the second stop she answered "Both stops altogether was about three seconds." This might well have ended the inquiry but the question was repeated in various forms *seven times*. Finally, succumbing to the suggestion that she had testified to two three-second intervals, plaintiff conceded "Yes, but I didn't mean that," and gave this explanation: "I meant I looked to the right and I looked to the left, and it was three seconds altogether. * * * For the first and second time we stopped." The probative force of plaintiff's testimony that both stops consumed a total of three seconds was not destroyed by the total exchange between plaintiff and Company counsel on this question.

Company claims plaintiff testified "that she never saw the bus and did not know of its whereabouts at the time the motor scooter started into the intersection." This version of plaintiff's testimony, reconstructed from the actual words she used, is not strictly accurate. From plaintiff's testimony on this phase of the case we conclude simply that plaintiff clearly and definitely testified that she saw the bus twice; once after the scooter came to its first stop, at which time the bus was about a half a block south of Schirmer, and again after the scooter started up, at which time the bus was nine feet away from the scooter.

Company claims plaintiff *"guessed* the bus was then one half block" to the south. It is true that at one time in the course of the long cross-examination she used the word "guess". On at least ten other occasions she made the definite, unequivocal estimate that the bus was "about a half a block" away when she first saw it. She is not to be cast as a matter of law for this one lapse.

Company implies a contradiction from plaintiff's testimony estimating the distance at a half a block, and her testimony that the bus was then "about at the bus stop." We find no contradiction here, in view of her testimony that "The bus stop was about a half a block away." Company's mistake is in assuming the truth of the bus operator's testimony, that the bus stop was 40–50 feet south of the intersection.

Considering the evidence most favorable to plaintiff, the bus was one half block, or 160 feet, south of the intersection when plaintiff first saw the bus. It was then traveling 20 m. p. h. During the three seconds she looked at it the speed of the bus was reduced, and when the bus was 60 feet south of the intersection it was going 15 m. p. h. Schirmer is 30 feet wide, and the scooter was 6 feet from the north curb line of Schirmer, so the bus was 184 feet from the point of impact when plaintiff first saw the bus. If the scooter started forward three seconds after plaintiff first saw the

bus, the bus would have traveled no more that 90 feet in that time, and therefore the bus would have been 70 feet south of the intersection and 94 feet short of the point of impact when the scooter started forward. If 4 seconds elapsed between the time plaintiff first saw the bus and the starting forward of the scooter, the bus would have been 40 feet south of the intersection and 64 feet south of the point of impact when the scooter started forward. When the bus was 60 feet south of the intersection, proceeding at 15 m. p. h., it could have made an emergency stop in 35 feet, so there was ample time and space to avoid this collision, in the exercise of the highest degree of care, if the bus operator had seen the motor scooter. There was nothing to prevent him from seeing it, but he did not see it at all prior to the collision, or else he did not see it until he was right on top of it. "Clearly there was substantial evidence of the failure of the operator to keep a proper lookout, and evidence that had he done so he could have, by the exercise of the highest degree of care, avoided the collision." Anderson, J., writing on the same point with reference to this same collision, in Nelson v. St. Louis Public Service Co., Mo.App., 360 S.W.2d 356, 360 [1].

■ Company's second point relates to the first paragraph of plaintiff's verdict-directing Instruction No. 1, which follows:

"The Court instructs the jury that under the law of this State the defendant, St. Louis Public Service Company, by and through its driver, Alphonse Dickneite, owed the duty to exercise the highest degree of care to keep and maintain a constant, careful and vigilant watch and lookout ahead and laterally ahead while operating its bus so as to see, discover, and be cognizant of the presence, position, and movement of other vehicles at the intersection of Schirmer Street and Michigan Avenue."

Company's objection is that this abstract statement of law is incorrect because it makes Company an "insurer" of the safety of plaintiff instead of charging Company

with exercising the proper degree of care; that it placed an absolute duty on Company to have "seen or discovered" the presence of the vehicle on which plaintiff was riding as a passenger. In support of this theory, Company cites Welcome v. Braun, Mo.Sup., 319 S.W.2d 586, in which an instruction was condemned for barring recovery on the ground of contributory negligence if plaintiff *could* have seen defendant's car, *could* have realized that there was danger of collision, and *could* have stopped, thus placing upon plaintiff an absolute duty, and not merely requiring plaintiff to exercise the highest degree of care in seeing, realizing and endeavoring to stop. The two instructions are not analogous. In Welcome v. Braun the instruction totally failed to limit the lookout duty to the exercise of the highest degree of care, whereas in the instant the jury was instructed that Company "owed the duty to exercise the highest degree of care to keep and maintain a * * * lookout * * * so as to see, discover, be cognizant * * *." The duty was expressly stated as a relative duty, qualified by the requirement of the exercise of the proper degree of care. "It seems to us to lay down the proper rule, i. e., that defendant was under a duty to use the highest degree of care to see and discover the presence of other vehicles, and does not place an absolute duty upon defendant so to do." Nelson v. St. Louis Public Service Co., supra, 360 S.W.2d, l.c. 360 [2].

■ Company's third point relates to this portion of Instruction No. 1 italicized below:

"* * * *and if you further find that the defendant St. Louis Public Service Company, by and through its driver and agent, by the exercise of the highest degree of care in keeping a lookout and watch ahead and laterally ahead for westbound Traffic on Schirmer Street could and should have discovered the presence and movement of the motor scooter in time thereafter, by the exercise of the highest degree of care, to have avoided the collision mentioned in evidence, * * *."*

Company's objection is that this authorized the jury to find against Company for failing to take evasive action upon the mere appearance of the motor scooter, even before there was any probability or likelihood of danger of collision; that Company had no duty to take preventive action until there was apparent danger of a collision, which basic fact the jury was not required to find. In support of this theory Company cites Stakelback v. Neff, Mo.App., 13 S.W. 2d 575; Nydegger v. Mason, Mo.Sup., 315 S.W.2d 816; Burke v. Renick, Mo.App., 249 S.W.2d 513; Greenwood v. Bridgeways Inc., Mo.App., 243 S.W.2d 111, and Rosenkoetter v. Fleer, Mo.Sup., 155 S.W.2d 157. The same point was raised and the same cases cited in Moore v. Ready Mixed Concrete Co., Mo.Sup., 329 S.W.2d 14, which also involved a "lookout" instruction. We pointed out that these cases, involving the precautionary duty to slacken, stop or swerve, are inapplicable where the negligence involved is the failure to keep a lookout; that in a "lookout" instruction it is not essential to hypothesize the exact manner and means in and by which defendant could have avoided the collision so long as there is substantial evidence that he had the means and ability to have so acted that a collision would have been avoided; that plaintiff is not required in a lookout instruction to insert a finding that the duty to act was dependent on the fact of apparent danger of collision; that in this type of submission (lookout) "it is generally considered sufficient to hypothesize failure to keep a lookout and require a finding that such failure was negligence and directly caused the collision." 329 S.W.2d l.c. 25 [9, 10]. See also Horrell v. St. Louis Public Service Co., Mo.Sup., 277 S.W.2d 612, 615 [5], and Anthony v. Morrow, Mo.App., 306 S.W.2d 581, 588 [8].

Company's suggestion that the instruction improperly authorized the jury to find against Company for failure to take evasive action if its operator saw or should have seen the motor scooter "as it came to a stop sign in a position of safety, some 12 feet back from the intersection where the collision took place" is without merit. The instruction was predicated not only on failure to discover the presence but also failure to discover the *movement* of the motor scooter, in time thereafter to have avoided the collision.

■ Company's fourth point is error in admitting in evidence Exhibit No. 1, a plat of the intersection, because "there was no showing that it was a true and faithful scale representation of the place, structures and landmarks it purported to represent as they existed on the day of the accident." Company argues that it was drawn from measurements made 11 months after the date of the collision in question: that it was conceded that the bus zone sign portrayed on the plat had been moved at least once since the date of the collision; that there was no evidence that the street had not been widened, or that buildings had not been torn down or other changes had not occurred in the interim.

Assuming the validity of Company's reasoning, and that it was error to admit the plat as evidence, it does not appear that the error was harmful to the rights of Company. The plat was used at the trial for the purpose of giving the jury a visual aid to the understanding of the locus in quo. Company counsel twice made use of it as an explanatory exhibit in examining witnesses. No condition shown on the plat, except the bus stop sign in the bus zone, was shown to have been different from the condition as it existed on December 15, 1959. The plat was not used to misrepresent the position of the bus stop sign or the bus zone. On the contrary, the transcript indicates that it was made clear to the jury that on December 15, 1959 the bus stop was a half block south of Schirmer, and not where the plat showed it to be.

■ Company's fifth point:

"The trial court erred in allowing plaintiff to place an 'X' on a plat of the intersection, which purported to repre-

sent the position of defendant's motorbus at the time she first observed it, when there was no proper foundation laid to show that plaintiff was competent to do so, or that she knew or understood the plat, its scale, the distances in inches, feet or yards portrayed therein, or the location of the landmarks portrayed therein; and the placing of said 'X' had no foundation from her testimony and was nothing more than guesswork, speculation and conjecture on plaintiff's part."

There is no merit to this point because the court, after first overruling Company's objection to plaintiff's marking the "X" on the plat, thereafter reversed its ruling, stated that it had improperly allowed her to do so, ordered that the "X" be stricken from the plat, and orally instructed the jury to disregard the "X" mark which plaintiff placed on Michigan Avenue. A motion for a mistrial on this same ground was overruled. In its motion for new trial Company complained of error in not declaring a mistrial on this ground, but failed to carry forward in its points and authorities the alleged error of the court in overruling its motion for a mistrial, and therefore has waived that point.

■ Company's sixth point is error in permitting reference in plaintiff's opening statement and in plaintiff's and her surgeon's testimony to a series of operations and skin grafts, surgical debriding and amputation of tissue and arteries. Company contends these were items of special damage not pleaded and were beyond the general allegations of injury that "plaintiff was caused to sustain certain serious, painful, permanent, progressive and disabling injuries to her person, to-wit: "(A) The plaintiff's left leg, ankle and foot, the bones, muscles, joints, tendons, tissues, nerves, cells and all parts thereof were broken, fractured, dislocated, displaced, sprained, strained, torn, cut, twisted, bruised, contused and rendered permanently weak, disfigured, impaired in function, and painful."

■ Supreme Court Rule 55.21 and § 509.200 provide: "When items of special damage are claimed, they shall be specifically stated." Evidence of the foregoing operations, etc. would have been inadmissible to augment plaintiff's damages *as special items of damage,* under this rule and statute, since operations of this kind are not the necessary and inevitable result of the type of injury pleaded. Weller v. Hayes Truck Lines, 355 Mo. 695, 197 S.W.2d 657; Devine v. Kroger Grocery & Baking Co., 349 Mo. 621, 162 S.W.2d 813; State ex rel. Grisham v. Allen, 344 Mo. 66, 124 S.W.2d 1080; Knaup v. Western Coal & Mining Co., 342 Mo. 210, 114 S.W.2d 969; Ziervogel v. Royal Packing Co., Mo.App., 225 S.W.2d 798. It does not follow, however, that the evidence was inadmissible for all purposes. "An injury or condition, though not pleaded, and therefore, not itself available as a part of the basis for the assessment of damages, nevertheless may be of such character as to constitute evidence tending to prove a condition or injury which is pleaded as a basis of recovery. The former does not lose its competency as evidence because it is not made a part of the cause of action pleaded." Gilchrist v. Kansas City Rys. Co., Mo.Sup., 254 S.W. 161, 164; Rosenzweig v. Wells, 308 Mo. 617, 273 S.W. 1071; Smart v. Raymond, Mo.App., 142 S.W.2d 100, 105; Garvey v. Ladd, Mo.App., 266 S.W. 727, 732; Wheeler v. Breeding, Mo.App., 109 S.W.2d 1237, 1242. Plaintiff specifically pleaded serious, painful, permanent and disabling injuries to the bones, tendons, tissues, etc. of all parts of her leg, disfigurement and impairment of function. *Plaintiff had a right to prove the necessary treatment for the injuries which were pleaded.* Plaintiff's counsel's statements at the time this evidence was challenged clearly indicate that it was offered for this reason. The surgeon testified that the skin grafts were necessary to provide coverage for the tissue that was exposed; that it was "absolutely essential that it be covered with some form of skin" and that the necrotic condition which required amputation of tissue developed "as a natural result of this

injury." Evidence as to the "mode and incidents" of this necessary treatment was admissible under the allegations to which reference has been made, Hollensbe v. Pevely Dairy Co., Mo.App., 38 S.W.2d 273, 275 [2], for the purpose of showing the seriousness of the injuries to plaintiff's leg and her probable suffering. Trascher v. Eagle Indemnity Co. of New York, La.Ct. App., 48 So.2d 695, 699 [5]; Gulf, C. & S. F. Ry. Co. v. Sullivan, Tex.Civ.App., 168 S.W. 473, 475 [2]. Plaintiff's instructions did not refer to the operations, etc. as an element to be considered in assessing the damages. Defendant had a right to an instruction limiting the purpose for which the jury could consider this evidence, but it did not see fit to offer such an instruction.

Company's seventh point is that the original verdict of $55,000 was so grossly excessive as to be conclusive proof that it was the result of passion, prejudice and misconduct upon the part of the jury, and that appellant is entitled either to a new trial or an additional remittitur. To substantiate this point appellant argues that (1) the functional residual of the injuries is minimal; that plaintiff admitted that she walked, ran, skated and conducted all of her normal activities, claiming only that she tired more easily than before; (2) the verdict was "undoubtedly influenced by at least one of the three jurors who made material misrepresentations under oath about their qualifications to sit as jurors"; and (3) the conscience of the trial judge was so shocked that he felt called upon to cut the verdict almost in half.

█ The mere size of a verdict—the fact that it may be excessive—does not in and of itself establish that it was the result of bias, passion or prejudice, without showing some other error committed at the trial. Nussbaum v. Kansas City Stock Yards Co. of Maine, Mo.Sup., 359 S.W.2d 335, 341, and cases cited. No other error is suggested, unless it be appellant's unsubstantiated statement that the verdict was influenced by one of three jurors alleged to have made mis-representations on voir dire as to their qualifications. This is not urged as a separate point on appeal, and no effort is made to point out what misrepresentations, if any, were made.

█ Is the verdict, as reduced by remittitur, still excessive? Plaintiff was rendered unconscious and woke up in the ambulance. When examined at the hospital she was in shock, pulse rate 140; somewhat obtundic. She had lost considerable blood from the open, bleeding wound on her leg, and required a blood transfusion. There was a gross deformity of the leg between knee and angle, due to the fact that plaintiff sustained two fractures of the tibia. The skin was laid open "like a book" from 2½ inches below the knee all the way to the ankle and across onto the dorsum of the upper part of the foot. The bone, the underlying muscle and its fascia covering were exposed. The artery into the dorsum of the foot was torn. The veins returning blood to the foot were destroyed. Nerves were destroyed. Leaves and sticks were ground into the fat and skin. Whole blood and fluids were administered until pulse rate was reduced, and then anaesthesia was administered and the wound irrigated, cleansed and debrided, which means removal of tissue which does not have an adequate blood supply to survive. The flap was sutured loosely into place. The two fractures were reduced, or realigned, under direct vision. There was gross damage to the soft tissues. A plaster cast was applied. Eighty per cent of the skin flap became necrotic (died). After adequate blood supply grew in from the bone on the deep surface the necrotic portion was removed by surgery, and thereafter split thickness skin grafts from plaintiff's thigh were grafted to provide coverage for the tissue that was exposed. There were two engrafting operations. She was in the hospital from December 15, 1959 to February 14, 1960. In March a small bone protruding through one graft was removed. In April examination revealed acceptable but not perfect alignment, and the need of further coverage for the leg.

Due to posterior angulation of the bone above the ankle the ankle was tilted about 20 degrees off the horizontal plane, resulting in an abnormal gait or stride. It was angulated in two places, and is a major deformity above the ankle, where the bone bows towards the front. This angulation could be corrected by an osteotomy, or refracture and realignment, which was not recommended. Left alone, nature might change but would not correct the deformity. In August, 1960 swelling was noted, due to destruction of veins and lymphatics. In October, 1961 the graft had healed and the swelling was very minimal. No arterial pulse was observable in the foot. The ankle joint remained tilted to the side approximately 20 degrees. The minimal residual angulation at the upper fracture had gradually corrected itself. There has been a gross alteration of the growth centers of the bone. The epiphysis is not closed in its entirety. The results of this were unpredictable, and could not be assessed until full maturity. The angulation of the ankle was permanent, and the widened ankle joint mortise eventually will lead to changes in the ankle joint. Whatever deformity remains when the epiphysis closes will be permanent. The veins and arteries will not restore themselves. The cosmetic damage is permanent and may become worse as time goes on.

Plaintiff, an 11-year-old girl at the time of the collision, sustained painful, serious, disfiguring injuries, was hospitalized two months, and emerged with a permanently damaged and distorted leg and a permanent limp. We must remember, however, that this is a broken leg case, not an amputation case. Although grievous and impressive the injuries do not compare in seriousness with those in many broken leg cases in which large verdicts have been upheld. Pins, wires, plates, traction, braces and crutches do not figure in this case. *No other members or organs of plaintiff's body were injured.* There was no testimony about pain, past, present or future (although plaintiff must have experienced considerable pain) and no evidence of headaches, nervous in-

volvement or psychic disturbance. There was a good union of both fractures; "a pretty good result"; no necessity of repeated hospitalization; no ulceration; no subsequent operations after discharge; no shortening of the leg. Although plaintiff tires more easily than before, she is able to run, jump, walk, skate and play, although not as hard and fast as previously, and if she skates or walks "a lot" her leg swells. There is no demonstrated loss or diminution of earning power; no demonstrated disability to earn a living or pursue normal household duties. No loss of earnings, doctor's and hospital bills, or other items of special damage are to be accounted for in this award.

We have reviewed a considerable number of verdicts in broken leg cases, challenged on the ground of excessiveness, not only in this state, but also in other jurisdictions. See 10 Mo.Digest, Damages ☞132 (6); and see résumés of more than 300 cases involving excessiveness of verdicts where one leg was fractured, in 16 A.L.R. 2d 3, § 108, beg. p. 257, and in the supplemental service. We have considered, among others, Hill v. St. Louis Public Service Co., 359 Mo. 220, 221 S.W.2d 130; Fortner v. St. Louis Public Service Co., Mo.Sup., 244 S.W.2d 10; Lang v. St. Louis-San Francisco Ry. Co., 364 Mo. 1147, 273 S.W.2d 270; Willis v. Wabash R. Co., Mo.Sup., 284 S.W. 2d 503; Chrum v. St. Louis Public Service Co., Mo.Sup., 242 S.W.2d 54; Gurley v. St. Louis Public Service Co., Mo.Sup., 256 S.W. 2d 755; Glowacki v. Holste, Mo.Sup., 295 S.W.2d 135; Bowyer v. Te-Co., Inc., Mo. Sup., 310 S.W.2d 892; De Mariano v. St. Louis Public Service Co., Mo.Sup., 340 S.W. 2d 735; Humes v. Salerno, Mo.Sup., 351 S.W.2d 749; and Hahn v. Terminal R. Assoc. of St. Louis, Mo.Sup., 355 S.W.2d 867.

Without tiresome repetition of the well-known rules, but considering all of the pertinent factors, and in spite of our reluctance to order a further cut where the trial court has ordered a substantial remittitur, Moore v. Ready Mixed Concrete Co., Mo.Sup., 329

S.W.2d 14, 32, it is our duty to declare that this verdict is still excessive by at least $7,500.

### Defendant Nelson's Appeal

■ Appellant Nelson assigns error in giving plaintiff's verdict-directing Instruction No. 2, which was based on failure of Nelson to keep a lookout.

We have concluded that No. 2 is not broader than the petition, and did not permit the jury to roam beyond the pleaded acts of negligence, e. g., that Nelson "failed and omitted to keep a proper lookout either ahead or laterally ahead for vehicles then and there present or approaching said intersection as aforesaid." No. 2 submitted failure of Nelson "to keep a lookout ahead and laterally ahead" and ability to discover the presence and movement of the bus, by "keeping a lookout and watch ahead and laterally ahead for northbound traffic on Michigan Avenue." This was no roving commission, and No. 2 is not broader than the petition. McCarthy v. Sebben, Mo.Sup., 331 S.W.2d 601, 604 [1].

Instruction No. 2 was not erroneous in not hypothesizing facts demonstrating the presence and movements of the bus in such a manner as to bring into existence a position of danger of collision between the two vehicles, or in not hypothesizing facts showing that Nelson could have avoided the collision. The same point was raised by appellant Company (Point No. 3). What we said there applies here.

There was no failure to prove that Nelson could have avoided the collision after a duty to act arose. Under the evidence the jury could find that after Nelson had stopped his motor scooter at the stop sign, and had both feet on the ground, he could see one half block or more to his left or to the south, at a time when the bus was approaching from the south at 20 m. p. h. at a point one half block south of Schirmer; that he could have seen the bus, but failed to see it; that he could have avoided the collision by re-maining in his stopped position until the bus passed through the intersection. There was no error in form, and ample evidence to support the giving of, Instruction No. 2.

■ Next, appellant Nelson assigns error in admitting in evidence Company's Exhibit A, the St. Louis City Hospital record pertaining to Nelson, dated December 15, 1959, containing this entry: "Does not know whether he was unconscious or not. Rational, but slightly confused. Alcoholic breath." (Notations made by Dr. J. Young, assistant resident in surgery.) Three objections are raised: 1. Immaterial, irrelevant, hearsay, not tending to prove that Nelson was intoxicated or disabled from consuming alcohol; 2. Privileged communication between doctor and patient, made for purpose of enabling doctors to treat Nelson, not plaintiff; 3. Nelson, who on cross-examination by Company counsel had denied drinking intoxicants, could not be impeached on this entirely collateral matter; Company was bound by his answer.

There was no objection on the ground that the hospital record was not qualified under the Uniform Business Records as Evidence Act, § 490.680, and appellant Nelson concedes that the hospital entry was made for the purpose of enabling the doctors at the hospital to treat him. This eliminates the hearsay objection. Allen v. St. Louis Public Service Company, 365 Mo. 677, 285 S.W. 2d 663, 666, 55 A.L.R.2d 1022.

■ The pleadings raised no issue of Nelson's intoxication. There was no direct testimony that he had taken any intoxicating drinks or that he was under the influence of intoxicants. On cross-examination Company counsel asked Nelson if he had had anything of an intoxicating nature to drink. Nelson said "No." Plaintiff's mother testified that she saw Nelson at her home a few minutes before the collision; that Nelson had nothing but a Pepsi-Cola to drink and there was nothing about his actions or conduct when he left the house to indicate that he had had anything to drink.

The bus driver testified Nelson drove his motor scooter through the stop sign without stopping at 20 m. p. h., with no headlight burning. A police officer who rode to the hospital in the ambulance with Nelson and was directly over him "Never smelled any alcohol at all."

Although the pleadings did not specifically raise the issue of intoxication, evidence that Nelson was not in full possession of his faculties or that his faculties were impaired by the use of alcohol would be admissible under the general issue. 5A Am.Jur. Automobiles and Highway Traffic, § 942, p. 832. Evidence that Nelson had been drinking intoxicants would be a circumstance to be considered by the jury in determining negligence or not—whether Nelson was capable of exercising the highest degree of care, and whether he did exercise that degree of care, in the operation of the motor scooter; would bear on the principal and ultimate issue and not on a collateral issue.

That Nelson had an alcoholic breath when admitted to the hospital would be a circumstance showing that he had been drinking. In Bilodeau v. Fitchburg & L. St. Ry., 236 Mass. 526, 540, 128 N.E. 872, it was held that a hospital record entry that an injured man vomited fluid with an odor of whiskey could be considered in deciding whether the patient had used whiskey shortly before the accident. In Clark v. Beacon Oil Co., 271 Mass. 27, 170 N.E. 836, a hospital record "marked odor [of] alcohol on breath," referring to a person injured in an automobile collision, was held admissible on the question whether he had been operating a vehicle under the influence of liquor. In Leonard v. Boston Elevated Ry. Co., 234 Mass. 480, 125 N.E. 593, a part of a hospital record "Odor of Alcohol on Breath" was held properly admitted in evidence in an injury case. And see Cowan v. McDonnell, 330 Mass. 148, 111 N.E.2d 759.

When coupled with evidence of erratic driving (running through the stop sign without stopping at a speed of 20 m. p. h.) the evidence of alcohol breath became relevant and material. Cheatham v. Chartrau, 237 Mo.App. 793, 176 S.W.2d 865, 868 [1].

■ The claim of privilege has not been properly preserved for appellate review. When Company's Exhibit A was offered in evidence these objections were made: hearsay; no opportunity to cross-examine Dr. Young; prejudicial; collateral matter as to which, Nelson, having answered, could not be impeached; immaterial, irrelevant, and not proof of any pleaded issue; violation of Nelson's constitutional rights; tend to convict Nelson of a felony. That the exhibit was a privileged communication as between doctor and patient "was not assigned as a reason for excluding the exhibit from evidence when it was offered at the trial and such reason may not now be considered." Teel v. May Department Stores Co., 352 Mo. 127, 176 S.W.2d 440, 446 [12]; Ragsdale v. Tom-Boy, Inc., Mo.App., 317 S.W. 2d 679, 688, 689 [14].

The judgment is affirmed as to both defendants on the question of liability. If plaintiff within 15 days from the date of the filing of this opinion will file in this court a remittitur of $7,500, the judgment will stand affirmed as to both defendants as of the date of its rendition in the sum of $25,000. Otherwise the judgment will be reversed and the cause remanded for a new trial as to both defendants on the issue of damages only.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adoted as the opinion of the court.

All of the Judges concur.